UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DWIGHT JOHN )
    Petitioner )
                     ) Civ Action
    V. ) No.
                     )
LOIS RUSSO, and )
EDWARD FICCO, Superintendents )
Souza Baranowski )
Correctional Facility, )
    Respondent )

**05 11653 WGY**

PETITIONER'S MEMORANDUM IN SUPPORT OF
HIS MOTION TO VACATE THE CONVICTION AND SENTENCE BY
THE COMMONWEALTH OF MASSACHUSETTS SUFFOLK SUPERIOR COURT
AND THE AFFIRMANCE BY THE SUPREME JUDICIAL COURT
PURSUANT TO TITLE 28 U.S.C § 2254

SUFFOLK SUPERIOR COURT NO. 98-CR-11065
MASSACHUSETTS SUPREME JUDICIAL COURT NO. 09057

JAMES W. LAWSON
BBO# 289300
20 Park Plaza, Suite 905
Boston, MA 02116
(617) 227-3700

DATE: August 9, 2005

## STATEMENT OF THE CASE

Dwight John was indicted by a Massachusetts Suffolk Superior Grand Jury for murder in the first degree and possession of a firearm without a license. See Indictments attached as Petitioner's Appendix Volume II, p. 2. [1]  An evidentiary hearing on defendant's motions to suppress and dismiss was held on September 5, 2001 before the Honorable Patrick Brady in the Suffolk Superior Court. (PA III) The Court denied said motions on December 27, 2001. (PA II:21)

Trial commenced on July 15, 2003 before Suffolk Superior Court Judge Patrick Brady and ended on July 22, 2003. The jury returned a verdict of guilty for first degree murder. Transcript Volume V, page 30 (Tr 5:30).[2]  The jury acquitted the defendant on possession of the firearm used to murder the victim.  Ibid.

Mr. John appealed his conviction for murder to the Massachusetts Supreme Judicial Court ("SJC") on July 23, 2002 (PA II:1). The SJC denied his appeal on August 10, 2004. (PA I: 1) He did not appeal to the United states Supreme Court within the allotted ninety (90) days. Consequently, Mr. John has exhausted his state appeals in the instant matter.

---

[1]

Petitioner's Appendix shall be referred to hereinafter as Petitioner's Appendix, Volume, page or "PA II:2" for example.

[2]

Trial transcript volumes and pages will be referred to as Transcript Volume 5:page 30 or abbreviated as "Tr 5:30" for example. Only excerpts shall be provided.

1

Mr. John is presently incarcerated in Souza Baranowski
Correctional Facility in Shirley, Massachusetts.  Consequently,
the superintendent of that facility has been named as the
Respondent.

## SUPPRESSION HEARING FACTS

The Honorable Partick Brady held an evidentiary hearing on
defendant's motions to suppress and dismiss in the Suffolk
Superior Court on September 5, 2002.   The defense sought to
suppress Mr. John's June 20, 1997 confession to FBI Agent Green
on the following pertinent grounds that: (1) the federal
government granted Mr. John informal use immunity; and (2) Mr.
John's confession was not voluntary because he reasonably
believed that he had use immunity. Defendant also filed a Motion
to Dismiss pursuant to Kastigar v. United States, infra.  The
trial court denied these motions. (PA II:25,51,69,91,124,137)

The Commonwealth called Assistant United States Attorney
David Novak as their first witness at the combined motion to
suppress/dismiss hearing.  He testified that Mr. John came to his
attention on February 29, 1996 from the New York Police
Department.  (PA III:35)[3] Mr. John was revealed as a member of the
Poison Clan gang which originated in New York but had tenacles
all the way to Boston and Virginia. (PA III:36) He received

---

3

The Suppression hearing transcript shall be designated herein as
Petitioner's Appendix, Vol. III, pg35 or "PA III:35"

2

sketchy details from the NY Police about Mr. John's involvement in the Poison Clan, the murder of its leader, George Chang, and the Poison Clan's link to Boston. (PA III:36-42)

This report caused AUSA Novak to seek Mr. John's cooperation in a case that he was building against Poison Clan members Dean Beckford and others in Virginia. (PA III:43) AUSA Novak called NY Police Inspector Storch, who provided background on Mr. John. (PA III:44)

Storch told Novak that Mr. John had been his student at John Jay College and that he was bright. (PA III:44) Novak testified that Storch also said that John approached him about cooperating and stated that he did not want a deal. (PA III:44-45) John was jailed awaiting trial on a NY state offense.

AUSA Novak then contacted the ADA in Mr. John's present NY case and determined that Jennifer Feiss was his lawyer. (PA II:42) Attorney Feiss told Novak that she could not represent John in the federal case, but would facilitate his cooperation. (PA II:42; PA III:49) She spoke with John who agreed to go to Virginia.  (PA III:42) As part of his cooperation, she asked that Novak get him appointed counsel and give him a proffer letter so he would receive immunity for his statements during the proffer sessions. (PA III:49-50) Novak agreed and John, through Attorney Feiss, consented to (1) cede to federal jurisdiction and custody, (2) travel to Richmond Virginia in federal custody and (3) meet

3

with AUSA Novak about the Poison Clan. (PA III:49-50; PA II:42)

On April 14, 1996, Mr. John met with AUSA Novak where he was presented with an immunity letter. (PA III:51-53; PA II:187) This letter was reviewed and approved by Attorney Feiss in advance of the proffer meeting. (PA III:51) The letter stated that John would be granted immunity for statements made during the meetings with the federal government. (PA II:187) This type of immunity confers use immunity upon the defendant while he is cooperating and includes a waiver of a defendant's rights under United States v. Kastigar. (PA II:187)

AUSA Novak testified that he asked Mr. John if he wanted an attorney when they met on April 14th. (PA III:51-53) Novak testified that Mr. John rejected the offer of legal counsel and they spent a ½ hour discussing the question of lawyers. (PA III:53,54) Novak testified that he would have gone to the U.S. Magistrate and petitioned for appointed counsel but Mr. John said he did not want one. (PA III:1:55)⁴ Novak admitted that he did not take any notes to support his testimony.

Mr. John was then presented with the proffer letter, but he refused to sign it. (PA III:52, 55)⁵ Despite Novak's agreement

---

⁴

Mr. John contradicts this in his affidavit where he states he was never asked if he wanted a lawyer. (PA II:37)

⁵

Mr. John agrees that he did not sign this letter, but states that he believed he already had immunity and was confused by the letter. (PA II:37)

4

with Feiss to provide counsel, he did not call Feiss in advance

to have her speak with John to ensure that he understood the

consequences of his decision.[6]

AUSA Novak admitted that this Poison Clan case was a "huge"

case for him as it was one of the first federal death penalty

cases and had over forty defendants. (PA III:47) He was eager to

get information from Mr. John to bolster his case against these

defendants and he surmised that Mr. John had animosity toward the

Beckford group so he'd be willing to talk. (PA III:47,56)

AUSA Novak spent the next three hours getting details from

Mr. John about the Poison Clan. (PA III:59) He knew that John

had been arrested in Boston for murder and testified that he

asked John whether he had ever killed anyone to which John

allegedly responded "no."[7] (PA III:61) John, however, implicated

himself as involved in the Chang murder in NY. (PA III:61)

While Novak took notes on this April 14, 1996  meeting with

Mr. John, these notes omitted reference to  (1) John's refusal of

_____

6

AUSA Novak described Mr. John's demeanor at the time as "quirky",
"bright" and "strong willed" (PA III:57) This was the very first
time he had met Mr. John (PA III:51) and he knew nothing about
his background except what he learned from the NY Police. (PA
III:59)

[7]Mr. Novak knew that John had previously been arrested for
the instant murder but the charges had been dismissed.  He made
no specific inquiry of John about this case until June 20, 1997.
Defendant surmises that the prosecutor only decided to make this
inquiry on the eve of trial, despite witnesses having implicated
John months earlier, because Mr. John had outlasted his
usefulness and had become more trouble than he was worth.

5

counsel or their alleged ½ hour discussion about legal representation, or (2) his alleged discussion about what limited use immunity meant or what the implications of <u>U.S. v. Kastigar</u> were.  (PA III:205, 209;PA II:164) These notes do, however, reflect Novak's discussion with John about his criminal activities with the Poison Clan.  (PA II:164)

Novak subsequently met with Mr. John on several other occasions at the Northern Neck Regional Jail in Virginia, where he was housed by the federal government while awaiting the Poison Clan trial. (PA III:62) Again, Novak took notes during these meetings but they omit any reference about lawyers, the status of his immunity or what these concepts meant relative to his possible prosecution in other jurisdictions for making inculpatory statements. (PA III:205, 209 PA II:164)[8]

On May 9, 1996, Mr. John testified before a federal grand jury about the Chang murder and his involvement in the Poison Clan gang. (PA III:64, 71-73) The Grand Jury transcripts show that Mr. John was not advised that he lacked use immunity or about his Miranda rights.  (PA II:189) John was, instead, simply told that he could be prosecuted for perjury if he lied. (PA II:189) The Grand Jury was also told that the Brooklyn DA's

---

[8]

This issue becomes even more significant as Novak later testifies that (1) he sent out notice to the Beckford defendants that Mr. John had use immunity for anything he said and (2) he told John that he was "stripping" him of his Fifth Amendment rights just prior to John's confession. (PA III:197,218)

Office had been contacted about John's cooperation because that was the only benefit that John had and he did not want there to be any misunderstandings. (PA III:64)[9]

Subsequently, Novak met with Mr. John at the Northern Neck Regional Jail and again discussed the details of the Poison Clan case. (PA: SH:76) Again, he asked whether John had been involved in any murders other than Chang and John stated no. (PA III:76-77, 152)

Mr. John proved to be "super cooperative" so he was flown by the Marshals to New York so that he could get a reduced sentence in his Brooklyn case. (PA III:81,79-80) John was returned to Virginia to await the upcoming trial against the Poison Clan members scheduled for June 9, 1997. (PA III:81, 83)

Prior to trial Novak was told that Mr. John was acting bizarrely beginning as early as August 1996. (PA III:84)  He heard that John was spreading feces around the jail walking around naked and acting crazy (PA III:85) Novak, who believed that John did not want to testify, told him that he was calling him as a witness regardless. (PA III:86) Despite this bizarre behavior, Novak did not seek to have John evaluated, did not attempt to provide him with psychiatric treatment or research his

---

9

You would think if the AUSA did not want any misunderstandings, he would have explained to Mr. John on the record that, if he lied, he would have been exposed to more than simply prosecution for "perjury".

7

psychiatric background. (PA III:161-162)[10]

Before May 21, 1997, Novak believed that John had "dug his heals in" and was not going to testify. (PA III:88)[11] As a result, they had an argument according to Novak about whether he would be forced to testify. Novak testified that he ultimately told John that he "was stripping him of his Fifth Amendment rights, I told him...first of all informally I'm telling him that he can't refuse to testify because I'm giving him informal immunity..."(PA III:92)[12] Novak further testified that he told John that he could "make an application to the Court and compel him, which is the same thing where you have use immunity basically for your testimony.... And either way, he has no Fifth Amendment rights. He is going to have to testify... whether he likes it or not." (PA III:93) None of these statements were included in the notes made by Novak during his meetings with John

---

10

Novak, in fact, testified that this was not his responsibility, but was the responsibility of defense counsel (Beckford's) to pursue this lead. (PA III:159)

11

Novak testified that he believed that John was bright based upon his conversations with him throughout this period of time. (PA III:89)

12

Novak also testified that earlier during the same discussion he told Mr. John that if he attempted "to assert the Fifth that I am telling that he had informal immunity as of that point, which was that anything he said while testifying could not be used against him..." (PA III:91) This is not recorded in Novak's notes. (PA II:164)

8

or sent in letters to John. (PA III:182,205 ,209) Novak did not

contact Attorney Feiss to discuss this matter with her or attempt

to find an appointed lawyer to explain the details of his

immunity. (PA III:199)

While Novak also testified that he was "giving him immunity

for what he said at trial..." and that he never "fulfilled what

he would get if he testified ....", he did not testify that he

stated this to Mr. John. (PA III:94,96) Again, there is no

contemporaneous record of this statement anywhere.

Novak did, however, send out a Notice Regarding Dwight John on

May 21, 1997 in advance of Beckford's federal trial to defense

counsel which stated the following:

### NOTICE REGARDING DWIGHT JOHN

Dwight John was prosecuted for robbery
by the Brooklyn District Attorney's Office.
The specific Assistant District Attorney
handling the prosecution was Paul Gliatta.
His defense attorney was Jennifer Feiss,
Esquire. ADA Gliatta was informed of the
cooperation of Mr. John in this case.
Based upon this information, ADA Gliatta
changed his plea offer to Dwight John from
5 to 10 years imprisonment to 3 to 6 years
imprisonment. He pled guilty on August 1,
1996 to robbery and was then sentenced on
September 11, 1996 to 3 to 6 years.

Additionally, Dwight John has been
informed that he has use immunity for his
statements, meaning anything that he says
cannot be held against him in any fashion.

9

Italics added)[13]

See Notice attached as PA II:162 (Suppression Hearing Exhibit 5) See also PA III:104,173-74,179.  Novak testified that he accurately represented the scope of Mr. John's immunity to the defense team through this Notice. (PA III:207)[14]

Novak also testified that a witness, who had informal immunity conferred upon him, would be free to speak with his office about his criminal conduct in preparation for trial.   (PA III:210, 214) The immunity would extend to pre-trial preparation. (PA III:214)[15]

Novak testified that he was aware that Mr. John had been charged with the murder of Lesmore Buffong (PA III:163) Novak never directly asked him whether he was involved as it did not feel it was relevant to his case despite the fact that another witness, Gordon, had previously told him that John had confessed to the Buffong murder. (PA III:164,177) The fact that the case

---

13

Novak further testified that he sent out this Notice because he blurted out to John that "you don't have the Fifth Amendment Right." (PA III:197)

14

Although there is no evidence that Mr. John received this Notice, it is consistent with John and Attorney Feiss' affidavits which state that they believed he had immunity from the beginning. (PA II:37,42)

15

Although Novak suggested in his testimony that such immunity could be retracted if a witness lied, there is no corroboration that this exception applied to John or that he understood that it applied. (PA: SH:210)

10

was dismissed meant that John could not be impeached on cross-examination, which was paramount in Novak's mind. (PA III:165-166)

Before Mr. John was to testify in Beckford, Novak sent Agent Green to meet with John. (PA III:223) Novak did not suggest that Green read John his rights in advance of this meeting on June 20, 1997. (PA III:199) After he learned that John confessed to Buffong's murder, he was not called as a witness. (PA III:195)

Agent Green testified that when he went to see Dwight John at Novak's request, he was not seeking to interrogate him about the Buffong murder. (PA III:231) He visited Mr. John in his 8x6 cell at the Northern Neck Regional Jail and spoke to him through the cell doors. (PA III:235-241) Green testified that John was "agitated" which was different than their previous four interactions. (PA III:242)

Agent Green testified that he knew Mr. John had been acting "bizarrely" in advance of this meeting. (PA III:261) He had learned from the prison that John had been walking around "muttering" to himself, spreading fecal matter around the prison and had attempted suicide. (PA III:261-262) Despite having this information, Green did not seek to have John evaluated, did not ask John whether he had a prior mental history and did not attempt to secure any treatment or disciplinary records from the Northern Neck Regional Jail to determine this witness' stability.

11

(PA III:262, 266).  Green testified that as far as he was concerned John was still a witness for the prosecution before he met with him on June 20, 1997. (PA III:265)

Agent Green then testified that he asked Mr. John whether the defendants knew information that he had not previously shared and whether Mr. John had committed a murder that he had not previously revealed. (PA III:242,261)  John said "yes." (PA III:242) Green testified that John then confessed that he had murdered Mr. Buffong in Boston, that Tristan Palmer was present during the murder and that the victim had a BMW. (PA III:243-244) Green knew all this in advance of his meeting with John. (PA III:245,255;PA II:264 )

Despite knowing about the Buffong murder in advance, Agent Green did not read Mr. John his Miranda warnings before eliciting the confession. (PA III:250) He ended the "interview" and informed AUSA Novak about the confession. (PA III:250)

· Boston Police Detective John McCarthy testified that he arrested Mr. John for murder on March 15, 1994 pursuant to a warrant. (PA: SH:280) He read John his warnings but did not explain to him what anything meant and John made no statements. (PA III:280)

The defense submitted a number of Mr. John's mental health records into evidence including the NY Department of Health and Bellevue Hospital Mental Health records (PA III:286; Suppression

Exhibits 14 and 15). These records show that John had serious mental health concerns in 1990 They also demonstrate that he attempted suicide in 1990 by jumping into a river in NY.

The Northern Neck Regional Regional Jail records were also admitted into evidence post hearing. (Suppression Exhibit 16) These records disclose that in 1997: (1) Mr. John banged his head against a wall badly enough on January 16 to require treatment; (2) he injured himself with a sharp piece of plastic on May 18th, (3) on May 25th, he walked around naked muttering to himself, (4) on May 29th, he poured milk over his own head, and (5) on June 2nd, he was found laying on the floor with some twine tied around his neck. These were admitted as part of the record. (PA III:286)[16]

## TRIAL FACTS

There is no question that the government presented sufficient evidence against Mr. John to support his conviction of murder in the first degree. The fact that they were able to introduce Mr. John's confession to FBI Agent Green was, however, the most convincing evidence of his guilt.

While Mr. John made other veiled admissions of his involvement in murder through letters to the government, the letters were not sufficient by themselves as they were vague.

---

[16]Given the sheer volume of these medical records, they will be provided upon request by the court.

13

Additionally, there was a significant amount of evidence introduced at trial that Mr. John had psychiatric problems which may have contributed to the content of those letters.

There were also witnesses who placed Mr. John in and around the victim at the time of his murder and Mr. John was arrested with the victim's car a few days after the murder.  One witness, Recardo Laidlaw, testified that after the murder Mr. John made veiled admissions about killing the victim.   This witness, as well as another named Gordon, had serious credibility problems as they were past gang members who dealt significant amounts of drugs, were involved in violence themselves, had been caught lying in other proceedings and were the focus of Mr. John's original cooperation.   These two witnesses were aware of Mr. John's cooperation against them in advance of their testimony at his murder trial, which established a strong basis for their bias against the petitioner and willingness to lie on behalf of the Commonwealth.[17]

### John's Federal Grand Jury Testimony

Mr. John's federal Grand Jury testimony was put into evidence at trial over his objection based upon the suppression motion.    (PA II:189) This testimony outlined his criminal history with the Poison Clan in New York.  He described how he

---

[17]Again, the parties will provided the trial transcripts after the Court instructs the respondent to respond to the petition and to provide the record of this proceeding.

14

grew up with Beckford, Gordon, Chang and Laidlaw in NY. (PA II 189; Tr. 3:67)   John and the others sold $15,000 worth of crack cocaine a day while working for Chang while they were in high school.   (PA II:189; Tr 3:68-69)

Mr. John's grand jury testimony stated that they were named the Poison Clan because all the gang was killing off each other. (PA II: 189; Tr 3:83) Mr. John knew that Chang had killed one of his friends. (PA II:189; Tr 3:80-81)

Mr. John testified that the gang began to fragment and everyone began conspiring about killing Chang (PA II:189; Tr 3:89) John, Gordon and others were present when Chang was murdered. (PA II:189: Tr 3:95)   Beckford opened a crack operation in Virginia shortly thereafter.   (PA II:189; Tr 3:94-95)

Subsequently, Beckford began talking about murdering another drug dealer because he was trying to take over his Virginia operation. (PA II:189; Tr 3:94-95) John gave details of Beckford's Virginia drug operation and the confession by Beckford that he had been involved in a Virginia shooting. (PA II:189 Tr 3:96, 100-102)

John testified that Gordon was part of the NY Poison Clan. (PA II:189; Tr 3:85) He also testified that Gordon was in control of the Boston operation. (PA II:189; Tr 3:109)

15

## FBI Agent Green Trial Testimony And The Confession

FBI Agent Green testified that Mr. John began to act somewhat bizarrely while awaiting to testify at the Virginia federal trial. (PA II: 274; PA III:334; Tr 2:142) He walked around naked muttering to himself and tried to commit suicide. (PA II: 274; PA III:334; Tr 2:178) Green went on to testify over defense objection[18] that he believed that John did not want to testify because the main defendants, Beckford and Dennis, knew about his criminal activity in Boston and, more specifically, they knew he was wanted for the Buffong murder in Boston (PA III:334; Tr 3:201-202)

On June 20, 1997, Mr. John was awaiting his turn to testify. (PA III:334; Tr 2:147) Agent Green testified that he went to visit John to "take his temperature" and determine how he was feeling prior to testifying.[19] (PA III:334; Tr 2:147-150) While meeting with John, who was in a cell, he observed that John's demeanor was different than when they had met in the past. (PA III:334; Tr 2:150, 191) Green asked whether the defendants (Beckford, et al) knew something about his past. (Tr III:334;

18

Defendant moved for a mistrial based upon this testimony but the request was denied. (PA: Tr 3:202)

[19]This testimony is consistent with fact that Mr. John was expected to testify at this point and had immunity. Green did not tell him that the prosecutor had revoked his immunity or that if he answered his questions, he'd be prosecuted. See Green's Suppression Hearing testimony also.

16

2:153) Over defendant's objection, Green testified that an
unrecorded conversation occurred between them where John admitted
to shooting Mr. Buffong. (PA III:334; Tr. 2:153-154, 189)

## ARGUMENT

Mr. John is effectively making two claims in his petition
pursuant for release pursuant to 28 U.S.C. § 2254.  First, he
submits that the Massachusetts Supreme Judicial Court and the
trial court's ruling that Mr. John's confession was not protected
against disclosure by an immunity grant from a federal prosecutor
was contrary to and an unreasonable application of U.S. Supreme
Court law.  Second, he submits that the state court's factual
finding that Mr. John's immunity was conditioned on his testimony
at the Beckford trial was based upon an unreasonable
determination of the facts in light of the evidence produced
during his motion to suppress/dismiss hearing.

### A.   STANDARDS FOR A STATE PRISONER HABEAS
### PETITION UNDER AEDPA

The Anti-Terrorism and Effective Death Penalty Act
(hereinafter "AEDPA")  objective is "to prevent federal habeas
'retrials' and to ensure that state-court convictions are given
effect to the extent possible under law." Bell v. Cone, 535 U.S.
685, 122 S.Ct. 1843, 1849 (2002). The statute provides:  (d) An
application for a writ of habeas corpus on behalf of a person in
custody pursuant to the judgment of a State court shall not be

17

granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(1)-(2) Petitioner raises both issues herein.

Habeas relief is appropriate if a state court decision is "contrary to ... clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). A state court decision is "contrary to" Supreme Court precedent if "it fails to apply the correct controlling authority," Hernandez v. Small, 282 F.3d 1132, 1141 (9th Cir.2002), or "where the state court 'applies a rule that contradicts the governing law set forth' in those precedents," Brumley v. Wingard, 269 F.3d 629, 638 (6th Cir.2001)(quoting Williams, 529 U.S. at 405) Chapman v. California, 386 U.S. 18, 24 n. 8, 87 S.Ct. 824 (1966) (stating that the right against coerced confession, the right to counsel and the right to an impartial judge were examples of constitutional rights "so basic to a fair trial that their infraction can never be treated as harmless error"). The Supreme Court, in Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495

18

(2000), set forth the standard of review a federal habeas court must apply under § 2254(d). The Supreme Court provided definitions for the phrases "contrary to," "unreasonable application of," and "clearly established federal law" in § 2254(d)(1). Id.

The Supreme Court first pointed out that the phrases "contrary to" and "unreasonable application of" must be given independent meanings. Id. at 404-05. A state court decision can be "contrary to" the Supreme Court's clearly established precedent in two ways: (1) "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law," and (2) "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" that decision. Id.

The Williams Court also stated that the word "contrary" "is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.' " Id. Thus, § 2254 "suggests that the state court's decision must be substantially different from the relevant precedent of [the Supreme Court]." Id. The Supreme Court suggested that this phrase would be applicable if the state court applies a rule that contradicts the governing law set forth in prior Supreme Court cases, such as if a state court were to hold that, in order to establish an ineffective assistance of counsel claim, a defendant

19

must prove by a preponderance of the evidence, instead of only a "reasonable probability," that the results of the trial would have been different. Id. at 405-06.

The Supreme Court held that an "unreasonable application" occurs when "the state identifies the correct legal principle from this Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id. at 410, 413 ("For purposes of today's opinion, the most important point is that an unreasonable application of federal law is different from an incorrect application of federal law.") (emphasis in original). See also Bell v. Cone, 535 U.S. 685, 698-99, 122 S.Ct. 1843 (2002)(holding that, for petitioner to succeed on a habeas claim, "he must do more than show that he would have satisfied [the applicable Supreme Court] test if his claim were being analyzed in the first instance, because under 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state court applied [Supreme Court precedent] incorrectly.... Rather, he must show that the [state court] applied [Supreme Court precedent] to the facts of his case in an objectively unreasonable manner.")

The Supreme Court also pointed out that, to determine the reasonableness of the state court's decision, a court must employ an objective test, not a subjective one. Williams, 529 U.S. at 376. The Williams Court also provided further guidance for the

20

phrase "clearly established holdings of the Supreme Court." Id.
at 412. The Court stated that this statutory phrase "refers to
the holdings as opposed to its dicta, of this Court's decisions
as of the time of the relevant state-court decision." Id.

As for § 2254(d)(2), a habeas reviewer should give due
deference to the factual findings of the state court and reverse
only when these findings are objectively unreasonable in light of
the evidence presented in the State court proceeding. Miller v.
Cockerell, 537 U.S. 322, 340, 123 S.Ct. 1029 (2003) Yet
"deference does not imply abandonment or abdication of judicial
review." Id. In other words, "[d]eference does not by definition
preclude relief." Id. Thus a federal habeas court can "disagree
with a state court's credibility determination." Id.

The lower federal courts are not, however, barred from
interpreting U.S. Supreme Court law or cases even when the
Supreme Court has not expressly ruled on the issue at hand. See
Evans v. Ray, 390 F.3d 1247 (10th Cir. 2004) and Robinson v.
Ignacio, 360 F.3d 1044 (9th Cir. 2004) The lower federal courts
have the discretion to evaluate whether the application of
federal law by the state court was reasonable or whether the
factual findings were objectively unreasonable in light of the
evidence presented in the state court proceeding. Id.

21

## B.   MR. JOHN'S PETITION MEETS THE EXHAUSTION REQUIREMENTS OF AEDEP

A state prisoner must exhaust his state remedies before bringing his claim in a federal habeas corpus proceeding. Title 28 U.S.C. § 2254(b), (c); Rose v. Lundy, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). Exhaustion is fulfilled once a state supreme court provides a convicted defendant an opportunity to review his or her claims on the merits. O'Sullivan v. Boerckel, 526 U.S. 838, 119 S.Ct. 1728 (1999). A habeas petitioner satisfies the exhaustion requirement when the highest court in the state in which the petitioner has been convicted has had a full and fair opportunity to rule on the claims. Rust v. Zent, 17 F.3d 155, 160 (6th Cir.1994); Manning v. Alexander, 912 F.2d 878, 881 (6th Cir.1990). If under state law there remains a remedy that a petitioner has not yet pursued, exhaustion has not occurred and the federal habeas court cannot entertain the merits of the claim. Rust, 17 F.3d at 160.

Mr. John has satisfied the exhaustion requirements of the AEDEP as he has raised the instant Fifth and Fourteenth Amendment claims with the Massachusetts Supreme Judicial Court ("SJC" hereinafter). The SJC denied his final state appeal on August 10, 2005. See Ellsworth v. Warden, 318 F.3d 285, 292 (1st Cir. 2003) The instant habeas petition is not due until one year from the date that the time period for filing for certiorari to the

22

Supreme Court had expired. (i.e., ninety (90) days after the date his appeal was finally decided by the highest state court)

## C. MR. JOHN'S PETITION TO VACATE HIS STATE CONVICTION AND SENTENCE SHOULD BE GRANTED

Mr. John filed motions to suppress both his 1996 federal grand jury testimony and his 1997 confession to FBI Agent Green and to dismiss his murder case based upon the fact that these conversations occurred within and were protected by an immunity grant by the United States Attorney's Office in Virginia. Defendant moved to suppress these statements on two pertinent grounds: (1) First, Mr. John had use immunity and, therefore, his statements were improperly provided to the Commonwealth; (PA III:1-29; PA II:25-137) and (2) Second, Mr. John's statements were not voluntary and were the product of governmental coercion because he reasonably believed that he had been granted use immunity. Ibid. The Suffolk Superior Court's erroneous decision to deny these motions and the Massachusetts Supreme Judicial Court's affirmance of that decision should be reversed for the reasons discussed below and pursuant to the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article XII of the Massachusetts Declaration of Rights. (Superior Court and SJC Opinions attached as PA I:21,1) Defendant properly objected to all these statements at trial. (PA III:334; Tr.

23

2:153-154, 3:1-7, 3:55-57)

1.    **THE IMPROPER ADMISSION OF MR. JOHN'S JUNE 1997
CONFESSION AND MAY 1996 GRAND JURY TESTIMONY DURING HIS
STATE MURDER TRIAL WAS CONTRARY TO AND AN UNREASONABLE
APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW IN
VIOLATION MR. JOHN'S FIFTH AND FOURTEENTH AMENDMENT
RIGHTS GIVEN THAT HE WAS GRANTED IMMUNITY BY A FEDERAL
PROSECUTOR**

Informal and/or conditional grants of immunity by

federal prosecutors are an essential component of criminal

justice system and to the United States Attorney General's

ability to secure cooperation from potential witnesses in federal

prosecutions. United States v. Mezzanatto, 513 U.S. 196, 115

S.Ct. 797, 207-208 (1995) If witness or defendant is granted use

immunity by a federal prosecutor, then that person's statements

and testimony can not be shared with another sovereign to

facilitate a separate prosecution. See Heath v. Alabama, 474

U.S. 82, 101 (1985) Such testimony would be considered compelled

and cannot be used against the speaker. Kastigar v. United

States, 406 U.S. 441, 458-460, 92 S.Ct. 1653 (1972); see also

United States v. Hubble, 530 U.S. 27, 120 S.Ct. 2037, 2039 (2001)

and Chavez v. Martinez, 538 U.S. 760, 123 S.Ct. 1994 (2003)

In Mr. John case, he was granted use immunity by the federal

prosecutor who was investigating a interstate crack conspiracy.

Despite this obvious and clear grant of immunity, the SJC

affirmed the lower court's finding that he had not been granted

24

immunity.  The SJC's decision was contrary to and an erroneous to clearly established United States Supreme Court precedent in violation of Mr. John's Fourteenth Amendment right to a fair trial and Fifth Amendment right not to have involuntary and/or compelled confessions used against him in a criminal proceeding was erroneous.  This decision must be reversed and Mr. John's state conviction and sentence vacated.

### Use Immunity Case Law

The right to grant immunity, formally or informally, to defendants and witnesses forms the bedrock of federal prosecutor powers and is the essence of securing witness cooperation. United States v. Mezzanatto, supra.  Once granted, immunity is likened to a contract which is generally governed by the terms of that agreement or order.  See Kastigar v. United States, supra; see also United States v. Conway, 81 F.3d 15,17 (1st Cir. 1996); United States v. Hogan, 862 F.2d 386, 388 (1st Cir. 1988); See also United States v. Quintanilla, 2 F.3d 1469 (7th Cir. 1993)(justice department has right to confer formal or informal use immunity)

Federal prosecutors have unilateral ability to grant a defendant immunity.  See United States v. Salerna, 974 F.2d 231,232 (2nd Cir. 1992)[rvsd on other grounds by United States v. DiNapoli, 8 F.3d 909 (2nd Cir 1993)] The terms of such a unilateral grant are equally enforceable as a mutual agreement

25

between the parties. Id. The scope of the immunity is dictated by the terms of the grant. See United States v. McFarlane, 309 F.3d 510,514 (8th Cir. 2002) The courts have refused to look outside the text of a written agreement or grant of immunity to revise or add terms that are not expressly stated in the writing itself. See United States v. Alegria, 192 F.3d 179, 185 (1st Cir. 1999)(court refused to read term not expressly made in the written agreement) and United States v. Burns, 160 F.3d 82, 83 (1st Cir. 1998) and United States v. Wheeler, 13 Fed. Appx. 852, 854 (10th Cir. 2001)(criminal defendants are prohibited from arguing that the government made oral promises not contained in the plea agreement). See also Parole Evidence Rule.

If a defendant relies upon an agreement not to prosecute or grant of immunity to his detriment, then the Courts can enforce the agreement or grant against the government and suppress the statement. Kastigar v. United States, supra; see also United States v. Brown, 801 F.2d 352,355 (8th Cir. 1986), United States v. Carter, 454 F.2d 426, 427-28 (4th Cir. 1972), United States v. Flemmi, 225 F.3d 78, 87 (1st Cir. 2000), United States v. Salemme, 91 F.Supp. 141; revsd on other grounds (D.Mass. 1999)(informal immunity is a promise which must be enforced) and Baglioni v. Chief of Police, 421 Mass. 229, 233 (1995) In informal immunity cases, the "government's ordinary remedy" in situations when a defendant "failed to cooperate fully...is a

26

prosecution for false statements, not abrogation of the immunity agreement and use of the [defendant's] statements." United States v. Williams, 809 F.2d 1072 (5th Cir. 1987)

The courts "should hold the government to 'a greater degree of responsibility than the defendant...for imprecisions or ambiguities in...'" such agreements or written promises. United States v. Wells, 211 F.3d 988 (6th Cir 2000)[quoting United States v. Johnson, 979 F.2d 396, 399 (6th Cir. 1992)]; United States v. Liranzo, 944 F.2d 73, 77 (2nd Cir. 1991). Ambiguities in a government promise must be resolved in favor of the defendant. Id. "While a contract is generally made when the parties verbally express their mutual assent to its essential terms, it may also be implied when the parties conduct manifests their agreement." United States v. McHan, 101 F.3d 1027 ( Cir. ) See United States v. Halloway, 74 F.3d 249 (11th Cir. 1996)(U.S. Attorney's agreement in hallway to provide use immunity was upheld and case dismissed pursuant to Kastigar)

## The Federal Prosecutor Granted or Promised Mr. John Immunity In Order To Secure His Testimony

On May 21, 1997, federal prosecutors provided written notice to defense counsel in a large crack conspiracy trial that Mr. John was not only a witness but specifically declared that Mr. John had "use immunity." See Notice Regarding Dwight John attached as PA II:162. The prosecutor further wrote that this

27

meant that "*anything that he says cannot be held against him in any fashion.*" (PA II:162)(italics added)[20] There was no ambiguity in this statement which was issued just one month before Mr. John's confession back in 1996.

Almost four years later, the federal prosecutor attempted to redefine these terms retroactively by testifying at Mr. John's motion to suppress that he never meant for this immunity Notice to be read so broadly. (PA III:94,96)  Regardless of his alleged subjective intent, the immunity Notice must be read as a contract or express promise--in accordance with its obvious terms--and in a manner where any ambiguities favor the defendant.  See United States v. Alegria, 192 F.3d 179, 185 (1st Cir. 1999); United States v. Wells, 211 F.3d 988 (6th Cir 2000); and United States v. Garcia, 956 F.2d 41,44 (4th Cir. 1992)(a term was enforceable where it had been memorialized in a cover letter but not contained in the plea agreement)

The SJC ignored the plain terms of this "Notice" or immunity promise, albeit a "Notice" that was unilateral and more akin to an order, when it ruled that the federal prosecutor had never granted Mr. John immunity for his statements or confession made to FBI Agent Green of June 20, 1996 and his statements about gang

---

20

Even if there is no evidence that Mr. John received this notice, it is the best contemporaneous evidence of what their agreement was at the time.

28

activity before the federal grand jury on May 9, 1996.   (PA
II:189) The SJC unreasonably relied upon the alleged subjective
intent of the prosecutor or, at best, his alleged verbal
statements that may have been made in advance of the written
promise of immunity. This ruling ignores the fact of the case and
is contrary to and constitutes an unreasonable application of
United States Supreme Court law and its progeny.

If one needed or was even permitted to look to the actions
or statements of the prosecutor that occurred before the
publication of the written promise of immunity to Mr. John, that
conduct or lack thereof would support the plain meaning its text.
For instance there is also no evidence that the federal
prosecutor informed anyone, including Mr. John, that he no longer
had use immunity prior to his confession on June 20, 1997.
Additionally, the prosecutor's notes and memos fail to contain
any reference this alleged conditional immunity language.

The prosecutor himself admitted on examination at the
suppression hearing that he had told Mr. John prior to the
issuance of this "Notice" that he was stripping him of his Fifth
Amendment right.   (PA III:93)   Mr. John filed an affidavit
stating that he believed that he had been granted immunity. (PA
II:37) When Mr. John testified before the federal grand jury in
1996, he was never given Miranda warnings and was simply told
that he could be prosecuted for perjury.   There was no mention

29

that he could be prosecuted for any of the drug crimes for which
he was about to testify about. (PA II:189) Even without the
"Notice", this is all compelling evidence that Mr. John was
granted immunity.

The fact that this federal prosecutor never wrote Mr. John a
letter revoking his immunity or filing a second notice to defense
counsel declaring the terms null and void further supports a
finding that this "Notice" was in effect on June 20, 1997; the
date of his confession.  The fact that this experienced
prosecutor never even bothered to draft a memo in his file or jot
some notes stating (1) that Mr. John's immunity had been revoked,
(2) that Mr. John had rejected such a grant for personal reasons
or (3) that he had failed to satisfy some unwritten condition[21],
is further compelling evidence that Mr. John confessed under the
umbrella of this broad immunity "Notice."[22]   (PA III:182,205,209)

Even if, aguendo, the federal prosecutor's testimony raised
any ambiguities about the existence of such a condition, that

_____

[21]The prosecutor testified that Mr. John's deal was
conditioned upon a him telling the truth. PA III:182,205,209)
The fact that he never told the federal agents about the Boston
murder at an earlier date was a violation of this agreement
according to the prosecutor.  There were no documents to support
this claim.

[22]

It should be noted that the federal prosecutor admitted under
oath that trial preparation fell under the protections of
informal or letter immunity grants.  The terms of the immunity
"Notice" is far broader than the traditional letter immunity
language.

30

ambiguity had to be resolved in Mr. John's favor under federal
law given the explicit grant contained in the May 21, 1997
"Notice".    United States v. Wells, supra.  All the objective
evidence manifests itself in a manner that clearly supports a
conclusion that Mr. John did indeed have use immunity as early as
May 21, 1997, the date the Notice was issued, if not before his
May 9, 1996 grand jury testimony and that there were no
limitations on that immunity.  The prosecutor's subjective
revisionism is, conversely, unsupported and the SJC's affirmance
of the trial court's rationale for denying his motion to suppress
is contrary to and an unreasonable application of U.S. Supreme
Court precedent and its progeny.

Once this Court determines that the prosecutor granted Mr.
John unconditional use immunity, then the logical conclusion must
be that Mr. John's statement or confession to Agent Green and his
earlier garnd jury testimony was obtained coercively. "Any
evidence induced by an equitable grant of immunity, although not
compelled by court order...,is coerced testimony for Fifth
Amendment purposes."  United States v. Carpenter, 611 F.Supp.
768, 776(1985)  See Shotwell Mfg Co. v. United States, 71 U.S.
341 (1963) Based upon the evidence presented at the suppression/
dismiss hearing in the state case, there can be no doubt that Mr.
John spoke on June 20, 1997 because he believed that he had
immunity and was required to answer FBI Agent green's questions.

31

Therefore, his statements on June 20th were compelled or coerced by this grant of immunity. Id.

It may not be surprising that the state court not only misconstrued the federal law on this issue but was unwilling to suppress evidence illegally obtained through a coercive grant of immunity by a federal prosecutor given their lack of experience with such matters. The federal judiciary has much more experience both with the immunity law and the machinations of the cooperation process to more fully appreciate how offensive the SJC's conclusions truly are. This court's experience together with principles of fundamental fairness, the law underlying Kastigar v. United States, supra, United States v. Mezzanatto, 513 U.S. 196 (1995) Heath v. Alabama, 474 U.S. 82, 101 (1985), Shotwell Mfg Co. v. United States and the other Supreme Court precedents and its progeny demand that this Court to uphold and enforce this immunity agreement as Mr. John relied upon it to his detriment when he testified before the federal grand jury in April 1996 and when he confessed to Agent Green on June 20, 1997. United States v. Brown, 801 F.2d 352, 355 (8th Cir. 1986)

Contrary to the finding of the SJC, the record is replete with evidence that Mr. John had use immunity and that his statements on June 20, 1997 were protected by the federal prosecutor's promise later put into writing: that "anything that he says cannot be held against him in any fashion." (PA II:162)

32

The SCJ's affirmance of the state trial court's decision that Mr. John did not have immunity or that it was conditioned upon testifying at the Beckford trial was contrary to and an unreasonable application of clear U.S. Supreme Court precedent.

Consequently, the federal prosecutors should not have provided the Suffolk County D.A.'s Office with a copy of Mr. John's confession to FBI Agent Green or his 1996 grand jury testimony and the state court should have suppressed this evidence before trial. See Kastigar v. United States, supra and Heath v. Alabama, supra. The disclosure and introduction of this evidence at trial was a violation of Mr. John's Fifth Amendment right not to have compelled statements used against him and the Supreme Court precedents discussed above that mandate that statements made under a grant of immunity cannot be used to prosecute the speaker of those words. Shotwell Mfg Co. v. United States, supra.

Wherefore, defendant moves this Court for an evidentiary hearing and to grant his petition pursuant to 28 U.S.C. 2254 and the Fifth and Fourteenth Amendments to the United States Constitution.

**2.   THE STATE COURT'S DECISION SHOULD BE VACATED AS IT WAS
      BASED UPON AN UNREASONABLE DETERMINATION OF THE FACTS
      IN LIGHT OF THE EVIDENCE PRESENTED AT THE MOTION TO
      SUPPRESS.**

In addition to its legal findings, the trial court's factual

findings supporting its denial of Mr. John's motion to suppress

were simply not supported by the record and were objectively

unreasonable in light of the evidence presented at the

suppression hearing. Miller v. Cockerell, 537 U.S. 322, 123 S.Ct.

1029 (2003)   For example, the trial court found:

> On May 21 1997, shortly before the trial in Virginia
> began, the government filed, in court,...notices"
> indicating "...that he 'has been informed he has use
> immunity for his statements, meaning that anything he
> says cannot be held against him in any fashion.'
> Exhibit 5. In the context of the discussion between
> Novak and John, Exhibit 5 meant that if John testified
> at the Beckwith trial in accordance with the prior
> grand jury testimony, he had use immunity for those
> statements." (PA I:21,26; Findings p 5, para 15)

Despite the trial court's finding that the immunity "Notice"

(referred to as Exhibit 5; PA II:162) meant that "if John

testified at the Beckwith trial in accordance with the prior

grand jury testimony, he had use immunity for those

statements..." Ibid, there was no credible evidence presented

that the immunity expressed in the "Notice" sent out to defense

counsel was conditionally based upon  Mr. John testifying at the

Beckford's trial.  Petitioner incorporates Section 1 above in

support.  While the prosecutor testified that he was "giving him

34

immunity for what he said at trial..." and that he never
"fulfilled what he would get if he testified ....", he did not
testify that he stated this to Mr. John.  (PA III:94,96)  The
state court's interpretation of these facts was objectively
unreasonable given the facts presented at the suppression
hearing.

Additionally, the prosecutor omits any such reference to
conditional immunity in his personal notes and failed to send
any letters to Mr. John which would suggest that the immunity
grant was conditional.  In other words, this factual finding,
which is the core of the trial court's decision to deny Mr.
John's motion, was wholly unsupported by any written amendment to
the written immunity promise or "Notice" or by any other credible
evidence.  Therefore, this Court should reject this factual
finding.

The state court's decision was based upon an unreasonable
determination of the facts in light of the evidence presented
during the hearing before the Suffolk Superior Court.  This
erroneous factual finding was not only material to the state
court's decision that Mr. John did not have immunity when he
confessed to the murder in June 1997, it was the driving force.
Clearly, if this Court finds that the immunity grant was not
conditional and that the immunity "Notice" sent out by the
prosecutor constitute the terms of the immunity grant, then the

state court's decision was erroneous and Mr. John's conviction
must be vacated along with his life sentence for murder pursuant
to Title 28 U.S.C. 2254.

## CONCLUSION

Petitioner Dwight John moves this Court to grant his
petition to vacate his state conviction and sentence pursuant to
Title 28 U.S.C. § 2254, the Fifth, Sixth and Fourteenth
Amendments to the United States Constitution and the foregoing
arguments.

BY DWIGHT JOHN'S ATTORNEY,

JAMES W. LAWSON, BAR# 289300
20 Park Plaza, Suite 905
Boston, MA 02116
(617)227-3700

36