UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DWIGHT JOHN,<br>  Petitioner,<br><br>v.<br><br>LOIS RUSSO,<br>  Respondent. | )<br>)<br>)  Civil Action No. 05-11653-WGY<br>)<br>)<br>)<br>)<br>) |

**RESPONDENT'S MEMORANDUM IN OPPOSITION
TO HABEAS CORPUS PETITION**

Lois Russo ("respondent") hereby opposes the application of Dwight John ("petitioner") for a writ of habeas corpus and urges this Court to dismiss his petition. As grounds, the respondent states that contrary to the petitioner's arguments in his memorandum in support of his petition ("Pet. Mem."), the Supreme Judicial Court of Massachusetts ("SJC") neither unreasonably determined the facts of the case, nor issued an opinion that was contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. *See* 28 U.S.C. 2254(d)(1)-(2). Further, the petitioner is not being held in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a).

**PRIOR PROCEEDINGS**

The facts underlying the petitioner's conviction are set forth in the SJC's opinion in *Commonwealth v. John*, 442 Mass. 329, 812 N.E.2d 1218 (2004).

I.  THE MURDER

  John was raised in a Brooklyn, New York neighborhood where he became friends with George Chang, Dean Beckford, Sean Henry, and Winston Gordon. By the late 1980's, these men had formed a gang, for which they adopted the name

2

the "Poison Clan."[1]  Under Chang's leadership, the Poison Clan sold large amounts of crack cocaine in the Brooklyn area.  Over time, dissension grew within its ranks, and on New Year's Day, 1989, Chang was murdered by another member of the gang.  After Chang's death, the Poison Clan broke into two factions -- one based in Virginia under Beckford's leadership, and another based in Boston run by John, Henry, and Gordon.

The Boston-based Poison Clan operation distributed crack cocaine procured by Henry and sold by local youths, including Buffong.  The operation was lucrative -- bringing in about $10,000 a day -- until Henry was murdered in New York in December, 1989.  With Henry gone, the Boston arm of the Poison Clan lost its supplier and was forced to shut down.  In 1990, John and Gordon returned to New York.  Later that year, without John's knowledge, Gordon returned to Boston to begin his own operation selling marijuana.  Gordon hired Buffong as one of his dealers.

On December 14, 1990, John and a friend from New York, Tristin Palmer, visited Boston.  Although they had no plans to meet him, John and Palmer accidentally encountered Gordon, who invited them to spend the night at his apartment.  The next day, the men met Buffong, who was driving a black BMW motor vehicle.  John commented on the quality of Buffong's automobile,[2] and when the men decided to go shopping, John rode with Buffong in the BMW.  The others followed in two vehicles.  Buffong purchased various articles of clothing, and when he paid for them, he displayed a large amount of cast to the group.  On the way back to Gordon's apartment, the vehicles became separated at a traffic light.  Buffong and John, in Buffong's BMW, made it through the light and disappeared.  The others returned to Gordon's apartment.  About one-half hour later, John returned to Gordon's apartment alone, carrying Buffong's automobile radio and keys.  John said that he had taken Buffong to visit a friend and that he was going to pick him up later.  John and Palmer subsequently left the apartment and returned without Buffong, but carrying the clothes he had purchased that day.  When Gordon asked about Buffong, John showed him a nine millimeter handgun and said that Buffong "had to go . . . . He was asking me too many questions."

Later that day, Boston police officers discovered Buffong's body in an alley.  He had been shot in the back of the head.  On December 24, 1990, John

---

[1] In footnote 2 of its opinion, the SJC stated: "The gang's name is a reference to a 'Kung-Fu' film called 'Five Deadly Venoms.'  The name was chosen because, as in the film, the gang's members were 'killing their own.'"

[2] In footnote 3 of its opinion, the SJC stated: "At the time, John did not own a motor vehicle."

3

> was arrested in New York City. He was driving Buffong's BMW; two guns -- one of them a nine millimeter -- were found in the car, together with Buffong's wallet. John was not prosecuted for Buffong's murder until many years later.[3]

*John*, 442 Mass. at 330-331, 812 N.E.2d at 1220-1221.

II.   THE FEDERAL AUTHORITIES IN VIRGINIA

The Court found the following facts with respect to the petitioner's involvement with federal prosecutors in Virginia:

> In 1996, while he was awaiting trial on an unrelated robbery charge in New York City, John contacted Arthur Storch, a high-ranking inspector in the New York City police department, with whom he had had a prior relationship. John told Storch that he had information regarding five gang-related homicides and that he would be willing to give this information to Storch, but did not want to be a witness and testify in court. In a series of interviews with members of the New York police department, John implicated Poison Clan members, including Beckford, in a wide range of criminal activity.[4] The New York police shared this information with Assistant United States Attorney David Novak, who was building a Federal case in Virginia against Beckford and other Poison Clan members. Novak made arrangements for John to be brought to Virginia in the hope that he would agree to become a cooperating witness.
>
> John's interaction with the United States Attorney's office while in Virginia is central to the disposition of his motion to suppress. At the evidentiary hearing on John's motion to suppress, John and Novak gave differing accounts of

---

[3] In footnote 4 of its opinion, the SJC stated: "The arresting New York police officer testified that he had received a report of a suspicious vehicle. When he checked the registration plates, he learned that the vehicle was wanted in connection with a Boston homicide. John was apparently prosecuted in New York for weapons charges related to the firearms found in the BMW, and served a prison sentence. In 1994, Boston police officers went to New York to serve an arrest warrant on John for the murder of Buffong, but due to insufficient evidence available at the time, the charge was subsequently nolle prossed by the Suffolk County district attorney's office."

[4] In footnote 6 of its opinion, the SJC stated: "John initiated his communications with the New York police and there is nothing in the record to indicate he received any consideration in exchange for the information he provided to them. Storch testified that John 'didn't really ask for anything. He said -- he gave me the information and he said, "I just don't want to testify, but I want to give you the information."'"

4

their meetings and conversations.[5]  After the hearing, the judge made the following findings of fact.

     When Novak and John first met, Novak advised John that he should be represented by local counsel, but John declined.  Novak spent one-half hour attempting to persuade John to accept representation, but John was adamant.  John also refused to sign a proffer letter prepared and presented to him by Novak that would have given him limited use immunity, and "emphatically stated that he wanted no deal; he just wanted to tell his story."  Novak believed that John's willingness to cooperate in the Virginia investigation was not based on a desire to secure immunity or a plea bargain, but rather to "even the score" with Beckford, whom John believed to be responsible for Henry's murder.[6]

     John was then interviewed on a number of occasions by Federal agents, including Novak, without any promise of immunity.  Subsequently, he testified before a Federal grand jury in Virginia about the Poison Clan's members, its drug selling operations and several gang-related murders.[7]  In exchange for John's grand jury testimony, Novak promised that he would notify the Brooklyn, New York, district attorney of John's cooperation in the Beckford investigation.  This agreement was put on the record before the grand jury when John testified.  The judge found that this was the only agreement between Novak and John.[8]

*John*, 442 Mass. at 332-334, 812 N.E.2d at 1221-1222.

---

[5] In footnote 7 of its opinion, the SJC stated: "In addition to Novak's testimony, the judge also had before him John's affidavit submitted in support of the motion to suppress."

[6] In footnote 8 of its opinion, the SJC stated: "In his affidavit, John claimed that Novak did not offer to provide him with an attorney, and that he did not sign the proffer letter because he believed that he already had been granted immunity as a part of his transfer to Virginia.  John averred that he was confused as to why Novak would offer to immunize him again when he was already protected.  The judge rejected this version of events."

[7] In footnote 9 of its opinion, the SJC stated: "The subject of Buffong's murder did not come up during John's grand jury testimony or the interviews that had preceded it.  During Novak's interviews, John was asked on more than one occasion whether he had ever killed anyone, to which he uniformly replied in the negative."

[8] In footnote 10 of its opinion, the SJC stated: "After John testified before the Federal grand jury, Novak did in fact inform the district attorney of John's cooperation, and the district attorney reduced his plea offer on John's New York robbery case from five to ten years down to from three to six years.  John accepted the offer and pleaded guilty."

5

III.   THE PETITIONER'S CONFESSION TO FEDERAL AUTHORITIES IN VIRGINIA

The Court found the following facts with respect to the voluntariness of the petitioner's confession to the murder of Mr. Buffong:

>   On the basis of John's testimony and other evidence, Beckford and others were indicted on charges of racketeering, conspiracy, continuing criminal enterprise, and multiple homicides.  As the Beckford trial approached, Novak learned that John, who remained incarcerated in Virginia, was acting strangely.  When Novak visited him, John said that he would not testify at trial.  Novak responded that John had no choice in the matter because, if necessary, Novak could strip him of his privilege under the Fifth Amendment to the United States Constitution by granting him immunity and compelling him to testify.
>
>   Thereafter, on May 21, 1997, shortly before the start of the Beckford trial, Novak filed notices with the court and defense counsel regarding both the criminal histories of prospective government witnesses and any rewards or inducements made in exchange for their testimony.  With respect to John, the notice indicated that he had already received a more favorable plea bargain from the New York prosecutor, and stated that he "has been informed that he has use immunity for his statements, meaning that anything that he says cannot be held against him in any fashion."  The purpose of the notice was to ensure that defense counsel would be in a position effectively to cross-examine John (and other witnesses similarly situated) at trial.  When viewed in the context of all of the conversations between John and Novak, the judge found this notice to mean that "*if* John testified at the [Beckford] trial in accordance with the prior grand jury testimony, he had use immunity for those statements" (emphasis in original).[9]  Because, as explained below, John did not testify at the Beckford trial, the judge further found that his statements and grand jury testimony were not protected by a grant of immunity.
>
>   On June 20, 1997, the Friday before John was scheduled to testify in the Beckford trial, FBI Special Agent Gerald Green, working with Novak, visited

---

[9] In footnote 11 of its opinion, the SJC stated: "John suggested that the May 21 notice speaks for itself and establishes a broad grant of immunity, and he emphasizes that the May 21 notice is the only documentary evidence on the subject of any immunity.  John's argument that he relied on the broad statement of immunity in the May 21 notice is, however, disingenuous.  John was never provided with a copy of the May 21 notice.  Therefore, the only basis John would have for believing that he was immunized was whatever he gleaned from his conversation with Novak, and the judge ruled that a reasonable person could not concluded from those conversations that he had been immunized."

6

John to "take [his] temperature." Green noticed that John seemed very agitated. He asked John whether the Beckford defendants knew something about him that the government did not, that might come up during his testimony at trial. John then told Green that he had killed Buffong. Green notified Novak of John's confession and, not surprisingly, Novak decided not to call John as a witness. Green reported John's confession to the Boston police, and John was reindicted for Buffong's murder in 1998.

*John*, 442 Mass. at 334-335, 812 N.E.2d at 1222-1223.

IV.    THE MOTIVATION FOR THE PETITIONER'S CONFESSION

Finally, the SJC found the following with respect to the petitioner's motivations for cooperating with the federal authorities in Virginia, and his confession to Mr. Buffong's murder:

> Throughout his cooperation with the government, the evidence regarding John's behavior was consistent with his stated desire to provide enough incriminating evidence against Beckford to "even the score" for Beckford's involvement in Henry's murder, but to avoid testifying. From the outset -- even in his first contact with Storch -- John expressed his desire to cooperate but not become a witness. When it became clear to John that Novak was going to seek to use him as a witness, he proceeded along a path intended to make himself as undesirable a witness as possible.
>
> John first engaged in a pattern of bizarre behavior. He walked around the prison naked, threw feces, poured milk on his head, cut himself, banged his head against a wall, and tied a string around his neck in an apparent attempt to commit suicide. This behavior did not, however, deter Novak form his plan to use John as a witness.[10] John next "dug in," and directly told Novak that he would not testify at trial. Novak's threat to strip him of his Fifth Amendment rights and force him to testify set the state for John's final act.
>
> In what can only be understood as an apparent act of desperation, John did the one thing he believed would keep him off the stand: he confessed to murder. From prior (and repeated) questioning on whether he had ever killed anyone, it was apparent to John that Novak did not want to use cooperating witnesses who were themselves guilty of murder, and John's confession had the desired effect of convincing Novak not to use him as a witness at the Beckford trial. In his

---

[10] In footnote 13 of its opinion, the SJC stated: As the judge noted, there was evidence that John was 'malingering [or] feigning his symptoms to advance his own agenda.'" (alteration in original).

7

> personal calculus, John may have decided that facing a homicide prosecution was
> a better fate than incurring the wrath of the Poison Clan for testifying against them
> at trial. In any event, based on the record before him, the judge did not err in
> concluding that John's testimony was voluntary.

*John*, 442 Mass. at 334-337, 812 N.E.2d at 1222-1225.

V.   THE SUFFOLK SUPERIOR COURT PROCEEDINGS

Subsequently, a Suffolk County grand jury indicted the petitioner for first-degree murder and unlawful possession of a firearm. *See* Mass. Gen. Laws. ch. 265, § 1; Mass. Gen. Laws ch. 269, § 10. On July 23, 2002, a Suffolk Superior Court jury convicted him of first-degree murder and acquitted him of the firearm charge (Brady, Patrick, J., presiding). *See* [Supplemental Answer ("S.A.") 4, 10, 12]. That same day, the trial judge sentenced the petitioner to the statutorily-mandated term of life imprisonment without the possibility of parole. *See* [S.A. 10]; Mass. Gen. Laws ch. 265, § 2.[11]

All Massachusetts first-degree murder convictions are reviewed directly by the Supreme Judicial Court. Mass. Gen. Laws ch. 278, § 33E. That court reviewed, and ultimately affirmed, the petitioner's convictions on August 10, 2004. *See Commonwealth v. John*, 442 Mass. 329, 812 N.E.2d 1218 (2004).

**DISCUSSION**

Since John's petition was filed after the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), this Court's review is governed by that act. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). "AEDPA provides that, when a habeas petitioner's claim has been

---

[11] Ten days later, the trial judge corrected the mittimus to reflect that the sentence was to be served concurrently with a sentence the petitioner was then serving in the New York state Department of Correction. *See* [S.A. 10-11].

8

adjudicated on the merits in state-court proceedings, a federal court may not grant relief unless the state court's adjudication of the claim 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' 28 U.S.C. § 2254(d)(1)[,]" *Brown v. Payton*, 544 U.S. ___, 125 S. Ct. 1432, 1438 (2005), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

"A state-court decision is contrary to [the Supreme Court's] clearly established precedents if it applied a rule that contradicts the governing law set forth in [Supreme Court] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme Court] but reaches a different result. *Williams v. Taylor*, [529 U.S. 362 (2000)]; *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). A state court decision involves an unreasonable application of [the Supreme] Court's precedents if the state court applies [the] Court's precedents to the facts in an objectively unreasonable manner. *Williams v. Taylor*, [529 U.S.] at 405; *Woodsford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (per curiam)." *Brown*, 125 S. Ct. at 1438-1439.

There is no bright line rule as to what constitutes an "objectively unreasonable" application of established Supreme Court precedent. *Williams*, 529 U.S. at 410. As the *Williams* decision makes clear, however, an unreasonable state-court determination is not the equivalent of an incorrect one. *Id.*

> Indeed, because Congress used the word "unreasonable" . . . , and not words like "erroneous" or "incorrect," a federal habeas court "may not issue the writ simply because the court concludes in its independent judgment that the relevant state-

9

>court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Hurtado v. Tucker*, 245 F.3d 7, 16 (1st Cir.) (quoting *Williams*, 529 U.S. at 411), *cert. denied*, 534 U.S. 925 (2001). *See also Kibbe v. DuBois*, 269 F.3d 26, 35 (1st Cir. 2001), *cert. denied*, 535 U.S. 960 (2002) (under AEDPA's "broad objective standard, a federal court cannot grant habeas relief simply because it disagrees with or finds error in the state court's application of federal law").

In addition, under the AEDPA, a state court's determination of the facts presented in the state court proceeding are presumed to be correct. *Miller-El v. Dretke*, 545 U.S. ___, 125 S. Ct. 2317, 2325 (2005). Nevertheless, a habeas corpus petitioner may rebut this "'presumption of correctness by clear and convincing evidence.'" *Id.* (quoting 28 U.S.C. § 2254(e)(1)). "The standard is demanding but not insatiable . . . '[d]eference does not by definition preclude relief.'" *Id.* (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).

In his habeas petition, and in his memorandum in support, the petitioner agues that the SJC, and the trial court, unreasonably determined the facts presented at a motion to suppress. Pet. Mem. at 34-35. These facts bear directly on the petitioner's principal claims, that the SJC unreasonably applied federal law in determining that a federal prosecutor in Virginia had not immunized him, and that as a result, his confession to the murder of Lesmore Buffong in Boston, purportedly given while under the impression that he had been immunized, was not voluntary. Pet. Mem. at 24-34. In this case, the SJC correctly determined the facts and correctly applied the pertinent federal law.

10

A.   The Commonwealth's Courts Acted Reasonably By Crediting The Testimony Of A Federal Prosecutor And Discrediting The Petitioner's Self-Serving Affidavit.

The petitioner argues "that the state court's factual finding that Mr. John's immunity was conditioned on his testimony at the Beckford trial was based on an unreasonable determination of the facts in light of the evidence presented during his motion to suppress/dismiss hearing." Pet. Mem. at 17, 34-35. Specifically, the petitioner criticizes the following findings of the trial judge:

> On May 21, 1997, shortly before the federal trial in Virginia began, the government filed, in court, two notices regarding John: one indicated that he engaged in behavioral violations while in Northern Neck Regional Jail in Warsaw, Virginia, see Exhibit 7,[12] and the other indicated that he "has been informed he has use immunity for his statements, meaning that anything that he says cannot be held against him in any fashion." Exhibit 5. In the context of the discussion between Novack [sic] and John, Exhibit 5 meant that <u>if</u> John testified at the Beckwith trial in accordance with the prior grand jury testimony, he had use immunity for those statements. The reason for the notice was to alert defense counsel in the Beckwith trial of the use immunity conferred on John so they could use it in cross examination, should he testify.

P.A. I: 25 (emphasis in original).[13] It is the petitioner's burden to establish, by clear and convincing evidence, that the state court's determination of the facts was incorrect. 28 U.S.C. § 2254(e)(1). This, he cannot do.

The petitioner presented the trial court with his version of events through his affidavit. For his part, the petitioner claimed that the federal prosecutor gave him immunity at some unspecified time and subsequently presented him with a proffer letter that he refused to sign, purportedly because he already had immunity. P.A. II: 37, ¶¶ 2, 4, 187-188. The petitioner now also seizes upon a notice filed by the federal prosecutor on May 21, 1997, a notice that he

---

[12] The petitioner does not challenge this facet of the court's finding.

[13] In accordance with the petitioner's memorandum, references to the petitioner's appendix will be cited as "P.A. <u>vol</u>: <u>page</u>."

11

admittedly did not receive at the time, *see* Pet. Mem. at 34, and claims that "it is the best contemporaneous evidence of what their agreement was at the time." Pet. Mem. at 28, n.20. In the petitioner's view, "there was no credible evidence presented that the immunity expressed in the 'Notice' sent out to defense counsel was conditionally based upon Mr. John testifying at . . . Beckford's trial." Pet. Mem. at 34.

On the other hand, the prosecutor testified at the suppression hearing that when he first met the petitioner, he "spent one-half hour attempting to persuade [him] to obtain counsel," but the petitioner "emphatically stated that he wanted no deal; he just wanted to tell his story." *John*, 442 Mass. at 333, 812 N.E.2d at 1222; P.A. III: 55. The prosecutor believed the petitioner's willingness to cooperate stemmed from his desire to "even the score" with Beckford with respect to a murder that Beckford had committed. *John*, 442 Mass. at 333, 812 N.E.2d at 1222; P.A. III: 56. Thus, the petitioner declined immunity, gave statements to the federal prosecutor, and testified before a federal grand jury. Beckford was indicted based on this and other testimony. *John*, 442 Mass. at 334, 812 N.E. 2d at 1222.

The prosecutor also explained that the May 21, 1997 notice was provided to defense counsel pursuant to *Giglio v. United States*, which requires prosecutors to disclose impeachment evidence against government witnesses. 405 U.S. 150, 154-155 (1972); P.A. III: 89-90, 103-105. As a result, contrary to the petitioner's claim, the notice was not an "immunity promise." Pet. Mem. at 28. Since the notice was issued pursuant to *Giglio*, and was never intended to describe a bargain struck between the petitioner and the government, it cannot be used to ascertain whether the prosecutor offered the petitioner full immunity from the moment they met, P.A. II: 37, ¶ 2, or, as the state court found, whether immunity was conditioned upon the petitioner's testifying at the

12

Beckford trial.[14]  *John*, 442 Mass. at 334, 812 N.E.2d at 1223; P.A. III: 104-105, 209-210.

In short, as the SJC noted, "[t]he issue here is strictly one of credibility -- whose account of their meetings and conversations was more credible, Novak's or John's." *John*, 442 Mass at 335, 812 N.E.2d at 1223.  Even outside of the habeas corpus context, questions of credibility are left to the sound discretion of the trial court.  *Davignon v. Clemmey*, 322 F.3d 1, 11 (1st Cir. 2003).  In this case, the motion judge credited Novak's version of events, and the SJC affirmed this finding, which was well-supported by the record.  *Id.* at 335, 812 N.E.2d at 1223; P.A. I: 26-27; P.A. III: 80-81,104-105, 209-210.  As a result, the petitioner has failed to rebut the presumption of correctness afforded the state court's factual findings.  28 U.S.C. § 2254(e)(1); *Miller-El*, 125 S. Ct. at 2325.

II.   THE SJC'S DECISION WAS NEITHER CONTRARY TO NOR AN UNREASONABLE APPLICATION OF SUPREME COURT PRECEDENT, BUT RATHER, A CORRECT APPLICATION OF FEDERAL IMMUNITY LAW TO THE FACTS OF THIS CASE.

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. On the other hand, "[t]he power of government to compel persons to testify in court or before grand juries and other governmental agencies is firmly established in Anglo-American jurisprudence." *Kastigar v. United States*, 406 U.S. 441, 443 (1972).  These seemingly diametrically opposed principles are harmonized by 18 U.S.C. § 6002, which requires the grant of use and derivative use immunity to a person who asserts his or her Fifth Amendment privilege

---

[14] Even the petitioner acknowledges that he did not receive a copy of the May 21 notice directly.  *See* Pet. Mem. at 34 (notice sent to a defense attorney in the Beckford trial).  Had the prosecutor intended the notice to set forth an agreement between himself and the petitioner, he logically would have provided the petitioner with a copy.

13

when called to testify.[15]

"Ordinarily, such immunity is granted under these provisions when a defendant refuses to testify, claiming the Fifth Amendment privilege against self-incrimination." *United States v. McLaughlin*, 957 F.2d 12, 16 n.4 (1st Cir. 1992). Such a grant must come from a judge and cannot, as the petitioner argues, come directly from a prosecutor. *Compare* 18 U.S.C. § 6002 (person presiding over hearing authorized to grant immunity) *with* Pet. Mem. at 31 (". . . the prosecutor granted Mr. John unconditional use immunity . . .").[16] In this case, the petitioner does not -- nor could he -- argue that he had been granted formal immunity. As a result, *Kastigar* is not applicable to this case and the SJC's decision cannot be deemed contrary to or an unreasonable application of it.[17]

---

[15] 18 U.S.C. §6002, provides: "Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to --
    (1) a court or grand jury of the United States,
    (2) an agency of the United States, or
    (3) either House of Congress, a joint committee of the two
Houses, or a committee or a subcommittee of either House, and the person presiding over the proceeding communicates to the witness an order issued under this title, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order."

[16] There is one exception to this general proposition. When a defendant waives his privilege against self-incrimination in consideration of a change of plea, the prosecutor's promise must be honored. *Santobello v. New York*, 404 U.S. 257, 262 (1971); *United States v. Flemmi*, 225 F.3d 78, 84 (1st Cir. 2000), *cert. denied*, 531 U.S. 1170 (2001).

[17] In his memorandum of law, the petitioner opines that the SJC misapplied federal immunity law due to its inexperience in this area. Pet. Mem. at 32. In fact, the associate justice who authored the opinion was the former chief of the Public Corruption Unit in the United States Attorney's Office for the District of Massachusetts, *see*

14

    B.    <u>Even If The Petitioner Had Been Granted Informal Immunity, There Would Be No Basis To Grant The Petitioner Habeas Corpus Relief</u>.

Informal immunity permits a prosecutor to assess the value and credibility of a potential witness's statement and permits a potential witness to speak with a prosecutor, presumably with an eye toward securing a plea bargain, without fear of prosecution for the information provided in the statement. *See United States v. Mezzanatto*, 513 U.S. 196, 207-208 (1995). "Informal promises of immunity have been recognized and enforced in a variety of circumstances short of the defendant's having claimed the Fifth Amendment privilege." *McLaughlin*, 957 F.2d at 16. "Since these immunity-in-exchange-for-cooperation agreements are in the nature of contracts, their scope and effects are strongly influenced by contract law principles." *Id.* (citing *United States v. Hogan*, 862 F.2d 386, 388 (1st Cir. 1988) and *Rowe v. Griffin*, 676 F.2d 524, 527-28 (11th Cir. 1982)). Because informal immunity agreements are, in essence, contracts, statements made pursuant to them cannot be considered compelled. *United States v. Flemmi*, 225 F.3d 78, 91 (1st Cir. 2000), *cert. denied*, 531 U.S. 1170 (2001); *Taylor v. Singletary*, 148 F.3d 1276, 1283 n.7 (11th Cir. 1998), *cert. denied*, 525 U.S. 1109 (1999). This, in turn, means that the petitioner has no viable Fifth Amendment claim.

Nor can the petitioner's confession to his murder of Lesmore Buffong be considered coerced, in violation of the Due Process Clause of the Fourteenth Amendment. *Compare* Pet. Mem. at 31. Recently, "'the Supreme Court has confined the voluntariness concept by holding that only [statements] procured by *coercive official tactics* should be excluded as involuntary.'" *Flemmi*, 225 F.3d at 91 (quoting *United States v. Byram*, 145 F.3d 405, 407 (1st Cir. 1998)

---

http://www.mass.gov/courts/courtsandjudges/courts/supremejudicialcourt/cordy.html, and as such, undoubtedly had significant experience in this area.

15

(citing *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)) (alteration and emphasis in original). "The mere fact that an unfulfilled promise was made in exchange for a person's statement does not constitute coercion, rendering the statement involuntary." *Flemmi*, 225 F.3d at 91 (citing *United States v. Walton*, 10 F.3d 1024, 1028 (3d Cir. 1993)). Thus, even if the federal prosecutor had granted the petitioner informal immunity, any breach of such an agreement would not result in the petitioner's confession being deemed coerced.

The petitioner is not being held in violation of the Constitution of the United States. 28 U.S.C. § 2254(a). Further, the SJC's decision is not contrary to nor an unreasonable application of any Supreme Court precedent, 28 U.S.C. § 2254(d)(1)-(2). Consequently, there is no ground upon which to grant the petitioner habeas corpus relief.[18]

## CONCLUSION

For the foregoing reasons, this Court should dismiss the petition for a writ of habeas corpus.

Respectfully submitted,

THOMAS F. RILEY
Attorney General

/s/ Daniel I. Smulow
Daniel I. Smulow, BBO 641668
Assistant Attorney General
Criminal Bureau

---

[18] The petitioner also requests an evidentiary hearing on this issue. *See* Pet. Mem. at 33. Because this case comes before the Court in the context of habeas review, 28 U.S.C. § 2254(e)(2) applies to preclude an evidentiary hearing unless the petitioner can demonstrate that his claim relies upon a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, or that the factual predicate could not have been previously discovered. The petitioner cannot meet his burden, and has made no attempt to do so. As a result, the Court should decline to hold an evidentiary hearing on this matter.

16

One Ashburton Place
Boston, Massachusetts 02108
(617) 727-2200 ext. 2949

Dated: October 18, 2005

**Certificate of Service**

    I, Daniel I. Smulow, hereby certify that on October 18, 2005, I served a true copy of this document by first class mail to counsel for the petitioner: James Lawson, Esq., 20 Park Plaza, Suite 905, Boston, MA 02116.

/s/ Daniel I. Smulow