UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DWIGHT JOHN          )
        Petitioner  )
                    )          Civ Action
    V.              )          No. 05-11653-WGY
                    )
LOIS RUSSO,         )
Superintendent      )
Souza Baranowski    )
Correctional Facility,  )
        Respondent  )

PETITIONER'S SUPPLEMENTAL BRIEF
IN SUPPORT OF HIS HABEAS PETITION

The Court has requested supplemental briefing on two
specific issues in the above Petition.  First, the Court has
identified a letter from AUSA David Novak to ADA Robert Totchka
dated September 23, 2000 ("Novak letter") and asked for the
parties to establish its history in the proceedings.  Second, the
Court has requested further briefing on the question of whether
the due process clause of the Fifth Amendment has application to
the present case.

**The Novak Letter**

This letter was provided by the Suffolk District Attorney's
Office in its discovery disclosures in Mr. John's murder case,
which is the subject of this habeas action.  See Affidavit of
James Budreau attached hereto as Exhibit A.  The letter was
attached to Mr. John's Motion to Suppress as Exhibit 2, which was

1

filed in the his Suffolk Superior Court murder case.  See Volume One of Appendix, pp 25,34 filed in Mr. John's appeal before the Massachusetts Supreme Judicial Court, excerpts from Volume I of the Appendix to the Supreme Judicial Court attached as Exhibit B and referred to as "SJC Appx:25,34."  At the end of the suppression hearing, which was held on September 5, 2001, trial counsel confirmed with the Superior Court Judge that the attachments to the motions were part of the record for purposes of the motion hearing and would be considered as exhibits. (PA III:288) The Novak Letter was subsequently included in the SJC Appendix, along with the Motion to Suppress in support of Mr. John's appeal of his conviction to the Supreme Judicial Court. (S.J.C. Appx: 25,34)

**Fundamental Fairness**

There is no question that Mr. Novak conferred use immunity on Mr. John back on May 21, 1997 (see Notice), if not earlier, in an effort to secure his testimony for the death penalty case Mr. Novak was preparing to try in June of that same year.  See Notice Regarding Dwight John attached as Exhibit C ("Notice") and September 23, 2000 Novak Letter attached as Exhibit D.  The September 23, 2000 Novak letter simply confirms that this.

The question before this Court is whether this immunity was (1) unambiguously "conditional" as represented by Mr. Novak and held by the state court in Mr. John's appeal or (2) unambiguously

2

unconditional as memorialized in the May 21, 1997 Notice written by Mr. Novak.    The state appeals court found that Mr. John did not have immunity when he confessed to the Boston murder on June 20, 1997 or when he testified before the grand jury on May 9, 1996.

Petitioner submits that the state court's finding was based upon a misapplication of settled federal law and an unreasonable application of the facts in light of the record.    In support, Petitioner has submitted throughout that (1) since he had his Fifth Amendment right "stripped" by Novak[1] and was granted unconditional use immunity, he was required or at least he reasonably believed he was required to answer the questions asked by Agent Green about the murder during pre-trial preparation, (2) he believed that his answers could not be used against him because he had immunity, (3) that he relied to his detriment upon the representations made to him by Novak about his immunity, and (4) his statements were, therefore coerced by this grant of immunity given the circumstances. [2]

---

[1]Novak admitted that he told Mr. John that he was stripping him of his Fifth Amendment right.    (PA III:197, 218)

[2]See Affidavits of Attorney Feiss and John(PA II:37,42) stating they believed the immunity was unconditional, Novak's statement at the 1996 grand jury that he could only be prosecuted for perjury(PA:189) and the 1997 Notice stating that he was given "use immunity for his statements, meaning anything that he says cannot be used against him in any fashion."(Exhibit C) This apparently expanded the immunity agreement so that he could not be prosecuted even for perjury

3

Petitioner has also raised through this case that it was fundamentally unfair for the federal government to have unilaterally decided that Mr. John breached the terms of the immunity and for the state to have used his confessions given (1) the unambiguous evidence that this immunity grant was not conditioned upon him testifying at trial or telling the truth; and/or (2) the lack of evidence that Mr. John understood beyond a reasonable doubt that Mr. Novak intended for this immunity grant to have been conditional. Petitioner has submitted that the state and federal government's conduct violated principles of fundamental fairness pursuant to the Fifth and Fourteenth Amendments to the United States Constitution.

Permitting Mr. Novak to exclusively define the terms of the immunity grant, as the state court did, was patently unfair and contrary to the case law and the weight of the evidence. As the U.S. Supreme Court held in held in <u>Richets v. Adamson</u>, 483 U.S. 1, 19 (1987):

> To grant to one party-here, the State-the unilateral and exclusive right to define the meaning of a plea agreement is patently unfair. Moreover, such a grant is at odds with the basic premises that underlie the constitutionality of the plea-bargaining system. Guilty pleas are enforceable only if taken voluntarily and intelligently. E.g., <u>Boykin v. Alabama</u>, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). It would be flatly inconsistent with these requirements to uphold as intelligently made a plea agreement which provided that, in the future, the agreement would mean whatever the State interpreted it to mean. Yet the Court upholds today the equivalent of such an agreement.

4

See also <u>Williams v. United States</u>, 47 Fed. Appx. 363 (6th Cir. 2002); and <u>Staten v. Neal</u>, 880 F.2d 962, 963 (7th Cir. 1989)

While Mr. John's case does not involve a plea agreement, there is no distinction between a plea agreement and a grant of immunity in the instant context as they both involve promises by the government.  See <u>United States v. DiNapoli</u>, 8 F.3d 909 (2nd Cir. 1993)  Under such circumstances, the ambiguities in a government's promise must be resolved in favor of a defendant. <u>United States v. Wells</u>, 211 F.3d 988 (6th Cir. 2000); see <u>United States v. Aguilera</u>, 654 F.2d 352, 354 (5th Cir. 1981) Therefore, the state court's decision to ignore all the evidence to the contrary and to permit Mr. Novak to not only define the terms but to retroactively redefine the terms of Mr. John's immunity was fundamentally unfair and a violation of Mr. John's due process rights. See Fifth and Fourteenth Amendments.

As described below, fundamental fairness and the Due Process Clause require this Court to find that (1) the terms of Mr. John's immunity were not conditioned upon (a) telling the truth or (b) actually testifying; (2) the unconditional grant of immunity by Mr. Novak as described in the May 21, 1997 Notice should be enforced; and (3) Mr. John's state murder conviction should be vacated as the federal government improperly provided the Suffolk County DA's Office with immunized statements and grand jury testimony which were then illegally used at his state

trial to convict him.

The objective evidence supports only one conclusion:   that Mr. John had use unconditional immunity when he testified before the federal grand jury and then when he later confessed to Agent Green during trial preparation.   The reason we know this is (1) the express terms of the May 21, 1997 Notice says exactly that; and (2) Mr. Novak told Mr. John during his May 9, 1996 grand jury testimony that he would only be prosecuted for perjury if he lied.   (PA II:189)   Mr. Novak did not tell Mr. John that he would be prosecuted for all his criminal admissions at either juncture but only for perjury.   More importantly, neither the statement made by Mr. Novak in 1996 before the Grand Jury nor one year later in the May 1997 Notice indicated that Mr. John's immunity would be voided if he lied or failed to testify[3].   This is pretty compelling objective evidence that (1) Mr. John's use immunity was not conditioned on the truthfulness of his statements or his actual trial testimony;[4] and (2) the government failed to demonstrate by proof beyond a reasonable doubt (or even by the preponderance of the evidence) that Mr. John knew that Mr. Novak

---

[3]It should be noted that Mr. Novak unilaterally decided not to call Mr. John as a witness.

[4] Petitioner also filed his own affidavit and one from his New York state lawyer, which stated that they believed Mr. John had unconditional use immunity from the beginning.   (PA II:37,42) Additionally, Mr. Novak admitted telling Mr. John that he was stripping him of his Fifth Amendment right. (PA III: 197)

had supposed intended to place these conditions on his use immunity.

The government has not provided any written documentary evidence contemporaneous with those events in 1996-1997 that would change or alter this conclusion, assuming that such evidence would even be permissible given the federal parole evidence rule. See United States v. Leniar, 111 Fed. Appx. 891 (9th Cir. 2004)("parole evidence is inadmissible to prove the existence of supplemental terms when a written contract is 'clear and unambiguous.'")[quoting United States v. Ajugwo, 82 F.2d 925, 928 (9th Cir. 1996)]; see also United States v. Alegria, 192 F.3d 179, 185 (1st Cir. 1999). Mr. Novak's notes do not even mention the issue of immunity and certainly do support a finding that the immunity were conditional or that it had been withdrawn or altered prior to Mr. John's June 1997 confession. Mr. Novak never sent Mr. John a contemporaneous letter informing him that the terms of the unconditional immunity evidenced in Petitioner's 1996 federal grand jury testimony and the May 1997 Notice of unconditional immunity had been altered or substantively changed or withdrawn. In fact, there is no concrete or documentary evidence from 1996-1997 to support the government's claims that the 1997 Notice was not in effect when Mr. John confessed to Agent Green on June 20, 1997 to the Boston murder or when he testified before the grand jury on May 9, 1996.

The failure of the government to produce some written document demonstrating that terms had been altered or that Mr. John had been notified that the terms of his immunity were somehow different from those contained in the unambiguous Notice sent out in May 1997 conflicts with Mr. Novak's 2001 testimony at the suppression hearing in Boston.  Assuming that Mr. Novak's testimony can even be considered substantively given the parole evidence rule,[5] it creates at most an ambiguity that must be resolved in favor of the Petitioner under long held principles of fundamental fairness. See United States v. Wells, 211 F.3d 988 (6th Cir. 2000)(under such circumstances, the ambiguities in a government's promise must be resolved in favor of a defendant); see United States v. Aguilera, 654 F.2d 352, 354 (5th Cir. 1981) and United states v. Garcia, 956 F.3d 179, 185 (4th Cir. 1992)(term was enforceable where it was memorialized in a cover letter but not in the plea agreement) The courts "should hold the government to a 'greater degree of responsibility than the defendant...for imprecisions or ambiguities..." in such agreements or written promises.  United States v. Johnson, F.2d 396, 399 (6th Cir. 1992) and United States v. Liranzo, 944 F.2d 73, 77 (2nd Cir. 1991)  To rule otherwise would permit Mr. Novak

---

[5]This is discussed extensively above and in both Sections C(1) and C(2) of Petitioner's original memorandum in support of this habeas Petition and response to the Respondent's Opposition. The state court's reliance on Mr. Novak's testimony to the exclusion of the other compelling evidence was unreasonable.

to redefine the terms of the immunity grant unilaterally in
contravention of the overwhelming evidence that contradicts his
view.   This would be a violation of Mr. John's due process rights
and principles of fundamental fairness.   See Richets v. Adamson,
483 U.S. 1 (1987); Williams v. United States, 47 Fed. Appx. 363
(6th Cir. 2002); Staten v. Neal, 880 F.2d 962, 963 (7th Cir. 1989)
and United States v. Brown, 801 F.2d 352, 355 (8th Cir. 1986)

Additionally, the introduction to Mr. John's grand jury
testimony on May 9, 2006 not only supports Petitioner's belief
that he had unconditional use immunity, but it contradicts Mr.
Novak's later position to the opposite.   (PA II:189) If Mr. Novak
wanted to ensure that Mr. John understood that his immunity was
conditional, he could have taken some very simple steps to
achieve that result.   These steps included: (1) calling Mr.
John's New York lawyer, who facilitated his cooperation from the
beginning, to inform her of the conditions; (2) calling the
federal public defenders and asking that a federal lawyer be
appointed to advise Mr. John about the extent of his immunity and
if he understood that it was conditional; (3) requesting an ex-
parte proceeding before a Magistrate Judge or District Court
Judge and holding a colloquy on this issue; or (4) simply writing
Mr. John a letter explaining the terms and conditions of his

9

immunity.[6]

Mr. Novak never took any of these simple steps to ensure that his alleged view of the immunity's scope was shared by Mr. John. Given the overwhelming evidence to the contrary, Mr. Novak cannot now rely solely upon his subjective state of mind to change the terms of the May 21, 1997 Notice and 1996 grand jury introduction which unambiguously evidence an unconditional grant of use immunity to Mr. John.[7] See <u>Ricketts v. Adamson</u>, <u>supra</u>.

But this is exactly what the Massachusetts Superior Court and SJC held. They disregarded established federal law and found that despite the overwhelming evidence to the contrary, Mr. Novak's testimony was sufficient for them to find that the immunity grant was conditional and, therefore, not in effect when Mr. John confessed on to the murder in 1997 and testified before the grand jury in 1996. This finding is a clear misapplication of federal law and unreasonable determination of the facts in light of the record. <u>Ricketts v. Adamson</u>, <u>supra</u>; <u>Williams v. United States</u>, <u>supra</u>; <u>Staten v. Neal</u>, 880 F.2d 962, 963 (7th Cir. 1989) and <u>United States v. Brown</u>, <u>supra</u>.

Based upon the foregoing, principles of fundamental

---

[6] Mr. Novak did not even make a contemporaneous notation in his notes or lawyer diary about the terms of the immunity.

[7] Under such circumstances the ordinary remedy would be to prosecute a defendant for perjury or false statements not abrogation of the agreement or immunity grant. See <u>United states v. Williams</u>, 809 F.2d 1072 (5th Cir. 1987)

fairness, the Fifth and Fourteenth Amendments to the United States Constitution and the arguments in his Habeas Petition and other supporting memoranda, Petitioner moves this Court to find that (1) Mr. John's grant of use immunity was unconditional and was in effect when he confessed to the Boston murder and when he testified before the grand jury; (2) the federal government improperly provided the Suffolk County DA's Office with this evidence in violation of this grant of immunity; and (2) vacate Mr. John's state murder conviction as the Massachusetts courts improperly admitted the evidence at his trial.

BY DWIGHT JOHN'S ATTORNEY,

/S/ JAMES W. LAWSON
JAMES W. LAWSON, BAR# 289300
20 Park Plaza, Suite 905
Boston, MA 02116
(617)227-3700

# EXHIBIT A

## AFFIDAVIT OF JAMES BUDREAU

I, James Budreau, do depose and state that the following is true:

1. I represented Dwight John in his Massachusetts murder case entitle Commonwealth v. Dwight John, Suffolk Superior Court No. 98-CR-11065. I am an attorney licensed to practice in the Commonwealth of Massachusetts in good standing with the local bar.

2. I have reviewed the letter dated September 23, 2000 sent from AUSA David Novak to ADA Robert Totchka. I received as apart of the discovery package provided by Mr. Totchka.

3. This was appended to Mr. John's motion to suppress and filed as an exhibit in that case.

Signed under pains and penalties of perjury,

JAMES BUDREAU

# EXHIBIT B

COMMONWEALTH OF MASSACHUSETTS
SUPREME JUDICIAL COURT

COMMONWEALTH

V.

DWIGHT JOHN

SUPREME JUDICIAL COURT
NO. 09057

---

DEFENDANT-APPELLANT'S APPENDIX ON DIRECT APPEAL
FROM CONVICTIONS BY A JURY
FOR MURDER IN THE FIRST DEGREE

SUFFOLK SUPERIOR COURT
NO. 00-CR-10425

VOLUME I

---

JAMES W. LAWSON
BBO# 289300
20 PARK PLAZA, SUITE 905
BOSTON, MA 02116
(617)227-3700

DATED: DECEMBER 8, 2003

TABLE OF CONTENTS
APPENDIX VOLUMES I, II and III

**VOLUME I**

Document                                                                Page

Notice of Appeal ...............................    1

Indictments ....................................    2

Docket Sheet ...................................    4

Notice Regarding Dwight John (Use Immunity) ....    39

AUSA David Novak's Handwritten Notes ...........    164

Court's Order Denying Motions to Dismiss,
Suppress and Preclude ..........................    16

Defendant's Motion to Suppress .................    25
(Partial Exhibits attached)

Defendant's Motion to Dismiss Based Upon
Kastigar Hearing ...............................    51

Defendant's Motion to Preclude Use of
Immunized Statements by Defendant
and Request for Kastigar Hearing ...............    58

Defendant's Supplemental Memorandum in
Support of Motion to Dismiss and Motion
To Suppress ....................................    69

Defendant's Second Supplemental Memorandum
In Support of Motion to Dismiss or Hold
Kastigar Hearing and Motion to Suppress ........    91

Commonwealth's Memorandum in Opposition to
Defendant's Motion to Dismiss and Suppress
Evidence .......................................    124

Defendant's Motion in Limine Regarding
Testimony Given By Defendant Before
Grand Jury .....................................    137

Defendant's Motion In Limine Regarding
Defendant's Alleged Poison Clan Activities .....    147

*File*

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss                                    SUFFOLK SUPERIOR COURT
                                               NO. 98CR11065

COMMONWEALTH          )
                      )
                      )
        v.            )
                      )
                      )
DWIGHT JOHN           )
        Defendant     )

## MOTION TO SUPPRESS STATEMENTS

Now Comes, Dwight John, who respectfully moves this Court to
suppress his alleged confession or statement obtained by the
federal government on or about June 20, 1997. As grounds for
this motion defendant states that this statement was the product
of a custodial interrogation where no Miranda warnings were
provided. As no valid Miranda waiver was obtained, Mr. John's
custodial statements were obtained illegally in violation of
Miranda v. Arizona, his Fifth and the Fourteenth Amendment rights
pursuant to the United States Constitution and Article XII of the
Massachusetts Declaration of Rights. Additionally, Mr. John was
induced into providing these statements based upon a grant of use
immunity by the United States Attorney's Office in the Eastern
District of Virginia. Consequently, these statements were
involuntary and obtained in violation of Mr. John's Fourteenth
and Fifth Amendment rights as well as his Article XII rights. In
support of this Motion defendant states the following:

1

## FACTS

1.  F.B.I. Special Agent Gerald Green reports that Dwight John admitted on June 20, 1996 that he shot and killed a man named Lezmore Bufong in Boston.  See Green Report attached as Exhibit 1.  This statement was admittedly obtained without Miranda warnings while Mr. John was in federal custody in Richmond, Virginia.  Exhibit 1.

2.  At the time of this statement to S/A Green, Mr. John had been cooperating against a group referred to as the Poison Clan.  See Letter from Assistant United States Attorney David Novak attached as Exhibit 2.  AUSA Novak confirms that Mr. John had use immunity and had agreed to cooperate with the federal government.  See Notice Regarding Dwight John attached as Exhibit 4.  In exchange for his cooperation, Mr. John received certain promises including, but not limited to: (a) not being indicted by the federal government relative to Poison Clan activities; and (b) not having his words used against him in "any fashion."  See Exhibits 4, 2 and Dwight John's Affidavit attached as Exhibit 3.  This agreement was still in effect when Mr. John made his statements to S/A Green on June 20, 1997 regarding Lezmore Bufong.  Exhibits 2, 3 and 4.

3.  Based upon the immunity agreement with the federal government, Mr. John felt he could answer S/A Green's questions about the Bufong case on June 20, 1996 without being prosecuted.

2



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of Virginia*

---

*Main Street Centre*        *804/819-5400*
*600 E. Main Street*        *Fax 804/771-2316*
*Richmond, Virginia  23219-2447*

*David Novak*
*Direct: 819-5485*

September 23, 2000

Robert Tochka
Assistant District Attorney
Suffolk County District Attorney's Office
One Bullfinch Place
Boston, Massachusetts 0214-2997
(617) 619-4126

Sent via overnight mail on September 25, 2000

Re:   Dwight John

Dear Mr. Tochka:

Please find enclosed the requested information for Winston Gordon, Ricardo Laidlaw, Mark Phillips and Dwight John.  I note that we do not have the transcripts from the guilty pleas of Gordon, Laidlaw and Phillips.  If defense counsel wants these transcripts, they can contact the court reporter, Sandy Beverly, at (804) 916–2267.

As for Mr. John, the following chronology occurred resulting his failed attempts to cooperate with our office.  We learned of Mr. John in February of 1996.  He was in custody at Rykers Island in New York City pending trial and reached out to NYPD Deputy Inspector Andy Stoisch, who had previously served as a teacher for Mr. John at John Jay College.  Deputy Inspector Stoisch had Sgt. William Butler interview Mr. John.  A copy of Sgt. Butler's report is enclosed.[1]  We were later told of Mr. John's statement and a copy of the report was faxed to me on February 21, 1996.  On February 29, 1996, I telephone Mr. John's attorney in New York, Jennifer Feiss, and discussed with her Mr. John's possible cooperation with this office.  We had a follow-up telephone call on March 4, 1996, during which we discussed a cooperation agreement with Mr. John and the possibility of placing him in the witness protection program.  Ms. Feiss took the position that she only represented him on his pending charges in New York City and that Mr. John was not seeking any type of agreement with our office.  I then caused a writ ad testificandum to be issued that required Mr. John to be transported to

---

[1]Sgt. Butler's report identifies a date of January 12, 1995 as the interview date but I believe the accurate date to be January 12, 1996.

Richmond to appear before the grand jury, which was investigating the criminal activities of the "Poison Clan."

Mr. John was transported to Richmond on April 17, 1996 and I met with him on that date for the first time at the U.S. Marshals Service with members of the Cold Homicide Task Force, who were investigating the "Poison Clan." Prior to our meeting, I prepared a proffer letter (a "Queen for Day" letter) which provided for use immunity for Mr. John. Mr. John refused to sign the proffer letter. I have enclosed a copy of the letter that he refused to sign. He repeatedly said that he did not want any deals from our office and just wanted to tell us what he knew. I also offered to have an attorney appointed for him in Richmond since he was indigent but he, again, said that he did not want a lawyer. We finally agreed only that we would disclose any cooperate that he provided our office to the District Attorney's Office in Brooklyn.[2] I note that Mr. John repeatedly stated that he did not participate in any homicides other than helping to dispose of the body of George Chang. He was again interviewed on April 18, 1996 and April 22, 1996.

Mr. John then appeared before the grand jury on May 9, 1996. I have enclosed a copy of the transcript.[3] You will note that, as is my standard practice, I set forth all agreements that we had with Mr. John at the beginning of his testimony. The only agreement with him was that we would notify the District Attorney's Office for Brooklyn of his cooperation, which we later did when he pled guilty in Brooklyn on August 1, 1996.

The only other benefits afforded Mr. John were as follows. Because numerous members of the "Poison Clan" were then housed in the New York prison system, the FBI flew Mr. John on their airplane to New York for his guilty plea on August 1, 1996 and then returned him to the Northern Neck Regional Jail in Warsaw, Virginia, where he was being housed by the U.S. Marshals. Also, On November 6, 1996, I wrote to Michael Urban of the New York State Department of Correctional Services and asked that Mr. John be housed at the Mid-Orange State Correctional Institution to serve his sentence in New York because of fears for Mr. John's safety. A copy of this letter is also enclosed. I also note that, on May 15, 1996, we flew Mr. John's parents to Richmond and discussed any potential threats to their safety as a result of their son's cooperation. Like their son, they rejected our offer to place them in the Witness Protection Program.

On June 17, 1996, I again spoke to Dwight John at the Northern Neck Regional Jail with FBI Special Agent Tom O'Donnell. At that time, I again specifically asked him if he had killed anyone. Mr. John said no. He did say that he had observed Philip Pierre kill George Chang and "Pablo."

In the spring of 1997, Mr. John began having problems while housed at the Northern Neck Regional Jail and indicated that may not cooperate with our office. I orally told him that he had use immunity for his statements to us, meaning that anything that he said cannot be held against him. I told him that this was conditioned upon him providing truthful evidence to us. Again, during this time period, he was telling us that he had not killed anyone. In early June of 1997, prior to the trial of the

---

[2]ADA Paul Gliatta in the Brooklyn DA's Office was handling Mr. John's case.

[3]I note that this transcript was provided in discovery during the prosecution of United States v. Beckford; therefore, the secrecy requirements of Fed. R. Crim. P. 6(e) no longer apply.

defendants in <u>United States v. Beckford</u>, I provided the defendants with a notice regarding Mr. John that informed them that I had conferred use immunity upon Mr. John. A copy of this notice is enclosed. We did not call Mr. John to testify at the trial of <u>United States v. Beckford</u>.

FBI Special Agent Gerald "Donnie" Green has already provided you with the reports regarding Mr. John's confession to having murdered Lezzmore Buffong. Special Green will be able to provide you with all facts surrounding Mr. John's confession. Special Agent Green can be reached at (202) 324-5968.

If you have any questions, please contact me at (804) 819-5485.

Sincerely,

HELEN F. FAHEY
UNITED STATES ATTORNEY

By:

David Novak
Assistant United States Attorney
Senior Trial Counsel

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA          )
                                  )
                                  )        Criminal No. 3:96CR66 - ALL
            v.                    )
                                  )
DEAN ANTHONY BECKFORD,            )
            Defendant             )
_____)

## NOTICE REGARDING DWIGHT JOHN

Dwight John was prosecuted for robbery by the Brooklyn District Attorney's Office. The specific Assistant District Attorney handling the prosecution was Paul Gliatta. His defense attorney was Jennifer Feiss, Esquire. ADA Gliatta was informed of the cooperation of Mr. John in this case. Based upon this information, ADA Gliatta changed his plea offer to Dwight John from 5 to 10 years imprisonment to 3 to 6 years imprisonment. He pled guilty on August 1, 1996 to robbery and was then sentenced on September 11, 1996 to 3 to 6 years imprisonment.

Additionally, Dwight John has been informed that he has use immunity for his statements, meaning that anything that he says cannot be held against him in any fashion.

Respectfully submitted,

HELEN F. FAHEY
UNITED STATES ATTORNEY

By:     David Novak
Assistant United States Attorney

# EXHIBIT D

GROUP C





**U.S. Department of Justice**

*United States Attorney*
*Eastern District of Virginia*

---

*Main Street Centre*                          *804/819-5400*
*600 E. Main Street*                          *Fax 804/771-2316*
*Richmond, Virginia  23219-2447*

*David Novak*
*Direct: 819-5485*

September 23, 2000

Robert Tochka
Assistant District Attorney
Suffolk County District Attorney's Office
One Bullfinch Place
Boston, Massachusetts 0214-2997
(617) 619-4126

Sent via overnight mail on September 25, 2000

        Re:    Dwight John

Dear Mr. Tochka:

        Please find enclosed the requested information for Winston Gordon, Ricardo Laidlaw, Mark Phillips and Dwight John. I note that we do not have the transcripts from the guilty pleas of Gordon, Laidlaw and Phillips. If defense counsel wants these transcripts, they can contact the court reporter, Sandy Beverly, at (804) 916–2267.

        As for Mr. John, the following chronology occurred resulting his failed attempts to cooperate with our office. We learned of Mr. John in February of 1996. He was in custody at Rykers Island in New York City pending trial and reached out to NYPD Deputy Inspector Andy Stoisch, who had previously served as a teacher for Mr. John at John Jay College. Deputy Inspector Stoisch had Sgt. William Butler interview Mr. John. A copy of Sgt. Butler's report is enclosed.[1] We were later told of Mr. John's statement and a copy of the report was faxed to me on February 21, 1996. On February 29, 1996, I telephone Mr. John's attorney in New York, Jennifer Feiss, and discussed with her Mr. John's possible cooperation with this office. We had a follow-up telephone call on March 4, 1996, during which we discussed a cooperation agreement with Mr. John and the possibility of placing him in the witness protection program. Ms. Feiss took the position that she only represented him on his pending charges in New York City and that Mr. John was not seeking any type of agreement with our office. I then caused a writ ad testificandum to be issued that required Mr. John to be transported to

---

[1]Sgt. Butler's report identifies a date of January 12, 1995 as the interview date but I believe the accurate date to be January 12, 1996.

Richmond to appear before the grand jury, which was investigating the criminal activities of the "Poison Clan."

Mr. John was transported to Richmond on April 17, 1996 and I met with him on that date for the first time at the U.S. Marshals Service with members of the Cold Homicide Task Force, who were investigating the "Poison Clan." Prior to our meeting, I prepared a proffer letter (a "Queen for Day" letter) which provided for use immunity for Mr. John. Mr. John refused to sign the proffer letter. I have enclosed a copy of the letter that he refused to sign. He repeatedly said that he did not want any deals from our office and just wanted to tell us what he knew. I also offered to have an attorney appointed for him in Richmond since he was indigent but he, again, said that he did not want a lawyer. We finally agreed only that we would disclose any cooperate that he provided our office to the District Attorney's Office in Brooklyn.[2] I note that Mr. John repeatedly stated that he did not participate in any homicides other than helping to dispose of the body of George Chang. He was again interviewed on April 18, 1996 and April 22, 1996.

Mr. John then appeared before the grand jury on May 9, 1996. I have enclosed a copy of the transcript.[3] You will note that, as is my standard practice, I set forth all agreements that we had with Mr. John at the beginning of his testimony. The only agreement with him was that we would notify the District Attorney's Office for Brooklyn of his cooperation, which we later did when he pled guilty in Brooklyn on August 1, 1996.

The only other benefits afforded Mr. John were as follows. Because numerous members of the "Poison Clan" were then housed in the New York prison system, the FBI flew Mr. John on their airplane to New York for his guilty plea on August 1, 1996 and then returned him to the Northern Neck Regional Jail in Warsaw, Virginia, where he was being housed by the U.S. Marshals. Also, On November 6, 1996, I wrote to Michael Urban of the New York State Department of Correctional Services and asked that Mr. John be housed at the Mid-Orange State Correctional Institution to serve his sentence in New York because of fears for Mr. John's safety. A copy of this letter is also enclosed. I also note that, on May 15, 1996, we flew Mr. John's parents to Richmond and discussed any potential threats to their safety as a result of their son's cooperation. Like their son, they rejected our offer to place them in the Witness Protection Program.

On June 17, 1996, I again spoke to Dwight John at the Northern Neck Regional Jail with FBI Special Agent Tom O'Donnell. At that time, I again specifically asked him if he had killed anyone. Mr. John said no. He did say that he had observed Philip Pierre kill George Chang and "Pablo."

In the spring of 1997, Mr. John began having problems while housed at the Northern Neck Regional Jail and indicated that may not cooperate with our office. I orally told him that he had use immunity for his statements to us, meaning that anything that he said cannot be held against him. I told him that this was conditioned upon him providing truthful evidence to us. Again, during this time period, he was telling us that he had not killed anyone. In early June of 1997, prior to the trial of the

---

[2]ADA Paul Gliatta in the Brooklyn DA's Office was handling Mr. John's case.

[3]I note that this transcript was provided in discovery during the prosecution of United States v. Beckford; therefore, the secrecy requirements of Fed. R. Crim. P. 6(e) no longer apply.

defendants in <u>United States v. Beckford</u>, I provided the defendants with a notice regarding Mr. John that informed them that I had conferred use immunity upon Mr. John. A copy of this notice is enclosed. We did not call Mr. John to testify at the trial of <u>United States v. Beckford</u>.

FBI Special Agent Gerald "Donnie" Green has already provided you with the reports regarding Mr. John's confession to having murdered Lezzmore Buffong. Special Green will be able to provide you with all facts surrounding Mr. John's confession. Special Agent Green can be reached at (202) 324-5968.

If you have any questions, please contact me at (804) 819-5485.

Sincerely,

HELEN F. FAHEY
UNITED STATES ATTORNEY

By:

David Novak
Assistant United States Attorney
Senior Trial Counsel