UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                 )
                                 )
                                 )
DWIGHT JOHN,                     )
                                 )
          Petitioner,            )
                                 )
          v.                     )   CIVIL ACTION
                                 )   NO. 05-11653-WGY
                                 )
                                 )
LOIS RUSSO,                      )
                                 )
          Defendant.             )
                                 )
```

MEMORANDUM AND ORDER

YOUNG, D.J.                                    October 13, 2006


I.   **INTRODUCTION**

Dwight John ("John") brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  John is seeking an evidentiary hearing and reversal of his conviction of first degree murder in Massachusetts Superior Court sitting in and for the County of Suffolk.  Pet. Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person In State Custody ("Habeas Pet.") [Doc. No. 1] at 1.  He argues that (1) the Superior Court and the Massachusetts Supreme Judicial Court's ("Supreme Judicial Court") rulings that John's statements and testimony were not protected from disclosure by a grant of immunity were contrary to and an

unreasonable application of United States Supreme Court decisions and (2) the state court's factual finding that John's immunity was conditioned on his testimony at another trial was based upon an unreasonable determination of the facts in light of the record and the evidence produced during the hearing on his motion to suppress and to dismiss.  Pet. Mem. In Support of Mot. to Vacate the Conviction and Sentence Pursuant to Title 28 U.S.C. § 2254 ("Pet. Mem.") [Doc. No. 2] at 17.

## II.  Factual[1] and Procedural History

In 1990, Lezmore Bufong ("Bufong") was killed in the Commonwealth and John was arrested and charged with his murder after being found in New York in Bufong's car with Bufong's possessions.  Findings of Fact, Rulings of Law and Order on Def.'s Mot. to Suppress, Dismiss, and Preclude ("Super. Ct. Op.") at 1 (December 27, 2001)(Brady, J.) in Pet. App. In Support of Mot. to Vacate the Conviction and Sentence Vol. I ("Pet. App. I") [Doc. No. 3] at 21 .  The Commonwealth later nol prossed the indictment for lack of evidence.  Id.  In 1996, while John was awaiting trial on an unrelated robbery charge in New York City, he contacted Deputy Inspector Andy Stoisch[2] ("Stoisch") of the

---

[1]  The description of the facts is based on the state courts' findings, which are presumed to be correct.  See 28 U.S.C. § 2254(e)1.

[2]  The record and state court opinions are inconsistent as to the exact name of the Deputy Inspector, alternating between Stoisch and Storch.

New York City Police Department, with whom he had a prior
relationship, stating that he had information he wanted to share.
Id. at 2.  In a series of meetings that followed, he provided New
York City police with information[3] on the criminal activities of
the Poison Clan[4] - a gang which John helped form in the late
1980's - including information regarding the murder of the Poison
Clan's leader George Chang ("Chang").  Commonwealth v. John, 442
Mass. 329, 330, 332 (2004).

The New York City police shared this information with
Assistant United States Attorney David Novak ("Novak"), who was
building a federal case in Virginia against Dean Beckford and
other Poison Clan members.  Id. at 332.  Through John's New York
attorney, Jennifer Fiess ("Fiess"), Novak inquired into John's
willingness to cooperate in the Poison Clan investigation.
Super. Ct. Op. at 2.  He was willing, but refused Novak's offer
to seek court-appointed counsel despite Novak's explanation that
he should be represented by Virginia counsel.  Id. at 2-3.  For

---

[3]  The Supreme Judicial Court found nothing in the record
indicating that John received any consideration in exchange for
the information he provided to them.  Commonwealth v. John, 442
Mass. 329, 333 n.6 (2004).

[4]  The Poison Clan sold large amounts of crack cocaine in
the Brooklyn area.  John, 442 Mass. at 330-31.  Dissension grew
within the ranks and, on New Year's Day, 1989, George Chang, the
leader, was murdered by another member.  Id.  After Chang's
death, the Poison Clan broke into two factions - one based in
Virginia under Dean Beckford's leadership and another based in
Boston run by John, Sean Henry, and Winston Gordon.  Id.

approximately thirty minutes, Novak attempted to persuade John
that it was in his best interest to have an attorney but John
continued to refuse.  Id.  John also refused to sign the standard
form proffer letter Novak presented to him.[5]  Id.  John
"emphatically stated that he wanted no deal; he just wanted to
tell his story."  Id.

Novak was not informed nor aware that John suffered from any
form of mental illness, though medical records submitted at the
motion to suppress hearing indicated that John had been
hospitalized various times for mental illness, first in 1990 in
connection with a possible suicide attempt and then on several
occasions in 1997 and 1998 while he was incarcerated in New
York.[6]  Id. at 3, 8.  Novak had John's record, which included
John's prior charge for the Bufong murder and subsequent
dismissal.  Id. at 3.  Over the course of several interviews with
John, Novak asked John more than once if he had killed anyone, to
which John replied in the negative.  Id.  The purpose of this
inquiry was to assess John as a witness and know whatever "dirt"

_____

[5] John admits that he refused to sign the proffer letter but
disputes that he was ever offered counsel, and stated that he
believed that he already had immunity, was confused as to why
Novak and the F.B.I. wanted to give him immunity again, and did
not understand the contents of the letter.  Aff. of Dwight John,
Pet. App. II at 37.

[6]  The Superior Court also noted several references in these
records to the possibility that John might be malingering or
feigning his symptoms to advance his own agenda.  Super. Ct. Op.
at 8.

the defense had on John.  Id.   John did, however, admit to providing the gun to Chang's killer.  Id. at 3-4.

On May 9, 1996, John testified before the grand jury, providing details about the Chang murder and the Poison Clan. Id. at 4.  In his testimony, John stated that he had agreed to cooperate with Novak's office and that the prosecutors had agreed to notify the Brooklyn District Attorney's office of his cooperation.[7]  Id.  This was the only agreement between Novak and John.  Id.  On October 2, 1996, the grand jury indicted Beckford and others, several of whom were incarcerated in the same facility as John.  Id.  Novak later received reports that John was acting bizarrely - walking around naked and throwing feces about.  Id.  Novak visited him and John informed Novak that he no longer wished to cooperate.  Id.  At a subsequent visit, John told Novak that he would refuse to testify.  Id. at 4-5.  They

---

[7]  Questioning by Novak of John before the Grand Jury:
Q: You are testifying pursuant to an agreement that –
First of all, you were arrested in New York on some charges; is that correct
A: Yes. That's true.
Q: And you've agreed to cooperate with this office and we've agreed to notify the Brooklyn DA's office of your cooperation; is that correct?
A: Yes. That's true.
Q: You understand, however, that you're still required to tell the truth and if you would lie to the grand jury, that that would constitute perjury?
A: Yes, I do.

Grand Jury Testimony of Dwight John Tr. at 2:17-3:3 in Pet. App. II at 190-191 (erroneously identifying the testifying party as Dwayne John).

argued about this and Novak explained that John would have no choice in the matter because Novak could immunize John, formally or informally.  Id. at 5.  The Superior Court judge observed that "[i]n context, [Novak's] statements concerning immunity were made in response to John's statement that he was going to refuse to testify on 5th Amendment privilege grounds."[8]  Id.

On May 21, 1997, after Novak's visit to John in prison and shortly before the federal trial in Virginia, the government sent two notices to the Poison Clan defendants regarding John: one indicating that John engaged in behavioral violations while in the Virginia jail and the other stating that John received a reduced plea in his robbery case as a result of the federal prosecutors informing the Brooklyn District Attorney of his cooperation and that "Dwight John has been informed that he has use immunity for his statements, meaning that anything that he says cannot be held against him in any fashion," Notice Regarding Dwight John ("John

Notice") in Pet. App. II at 162.  Id.

The Superior Court found that "in the context of discussion between Novak and John, [the notice] meant that if John testified

---

[8]   The Supreme Judicial Court found specifically that when John refused to testify, "Novak responded that John had no choice in the matter because, if necessary, Novak could strip him of his privilege under the Fifth Amendment to the United States Constitution by granting him immunity and compelling him to testify."  John, 442 Mass. at 334.

at the <u>Beckwith</u>[9] [sic] trial in accordance with the prior grand
jury testimony, he had use immunity for those statements." <u>Id.</u>

On June 20, 1997, during the Beckford trial, Novak sent FBI
Special Agent Gerald Green ("Green"), who is responsible for
coordinating witnesses for trial and assessing their demeanor for
testifying, to re-interview John. <u>Id.</u> The interview took place
in the U.S. Marshalls office in the courthouse, a well-lit room
approximately eight feet by six feet. <u>Id.</u> at 6. John appeared
agitated and Green inquired whether John was concerned that the
Beckford defendants knew something about which John had not
revealed to law enforcement. <u>Id.</u> John responded in the
affirmative and said that he killed Lezmore Bufong in Boston.[10]
<u>Id.</u> Green terminated the interview and reported the information
to Novak. <u>Id.</u>

Novak decided not to call John as a witness because of this
revelation about the Bufong murder and because the Beckford case
was proceeding well. <u>Id.</u> Green sent his report of the June 20th
interview to law enforcement officials in Boston. <u>Id.</u>

---

[9] The record is inconsistent with respect to naming Dean
Beckford, often referring to him, in error, as "Beckwith."

[10] This contradicts Green's own testimony before the grand
jury and at the motion to suppress hearing that he had asked John
directly if John had been involved in a murder that he had not
theretofore revealed to law enforcement. Mot. to Suppress Hr'g
Tr. at 243:7-19; 263:3-19 <u>in</u> Pet. App. in Support of Mot. to
Vacate the Conviction and Sentence Vol. III ("Pet. App. III");
Grand Jury Hr'g Tr. at 9:4-11 <u>in</u> Pet. App. II at 260.

In 1998, John was indicted in Massachusetts Superior Court
for Suffolk County for the Bufong murder, charged with murder in
the first degree and possession of a firearm without a license.
Id.; Pet. Mem. at 1.  An evidentiary hearing on John's motions to
suppress and dismiss was held on September 5, 2001.  Pet. Mem. at
1.  The Superior Court denied those motions on December 27, 2001.
Id.  Trial began on July 15, 2003 and on July 22, 2003, John was
found guilty of murder in the first degree but was acquitted of
the firearms charge.  Id.  He was sentenced to life in prison.
Habeas Pet. at 1.

John appealed his conviction to the Supreme Judicial Court
but was denied on August 10, 2004.  Pet. Mem. at 1.  John did not
seek certiorari from the United States Supreme Court within the
allotted ninety days and so has exhausted his state appeals.  Id.
John filed a petition for writ of habeas corpus and supporting
memorandum in this Court on August 9, 2005.  See Habeas Pet. at
1.

**III. DISCUSSION**

    **A.    Standard of Review**

There are two potential bases for granting an application
for a writ of habeas corpus under 28 U.S.C. § 2254:  the state
adjudication

> 1) resulted in a decision that was contrary to, or involved
> an unreasonable application of, clearly established Federal
> law, as determined by the Supreme Court of the United
> States; or

> 2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is contrary to clearly established Supreme Court precedent if the state court arrives at a conclusion opposite that reached by the Supreme Court on a question of law or if the state court decides a case differently from a decision of the Supreme Court on a materially indistinguishable set of facts. Williams v. Taylor, 529 U.S. 362, 413 (2000).

A state court decision is considered an unreasonable application of Supreme Court precedent if the state court identifies the correct legal rule but unreasonably applies it to the facts. Id. at 407. An unreasonable application exists when there is "some increment of incorrectness beyond error." Norton v. Spencer, 351 F.3d 1 at 8 (1st Cir. 2003). A state court decision is "unreasonable if it is devoid of record support for its conclusion or is arbitrary." Id.

A habeas petitioner can overcome a state court's factual findings by showing that they were based on an unreasonable determination of the facts in light of the evidence. Mastracchio v. Vose, 274 F.3d 590, 597-98 (1st Cir. 2001); 28 U.S.C. § 2254(d)(2). This analysis applies only to determinations of basic, primary, or historical facts. Ouber v. Guarino, 293 F.3d

9

19, 27 (1st Cir. 2002).  "Inferences, characterizations of the
facts and mixed fact/law conclusions are more appropriately
analyzed under the unreasonable application prong."  Id.

**B.  The Constitutional Question**

John argues that the state courts' decision to allow the
introduction of statements that were protected by an immunity
agreement is a violation of his Fifth and Fourteenth Amendment
due process rights and Fifth Amendment privilege against self-
incrimination.  See Habeas Pet. at 6-7, 9; Pet. Mem. at 25.
Respondent Lois Russo ("Russo") counters that John is not being
held in violation of the Constitution or laws or treaties of the
United States and therefore is not entitled to habeas relief.
See Resp't Mem. in Opp'n to Habeas Corpus Pet. [Doc. No. 11]
("Russo Opp'n") at 1, 14.  Specifically, Russo contends that
John's claims are governed by principles of contract, not the
Fifth Amendment.  See id.

A petition for habeas relief by a state prisoner must
articulate a claim under the Constitution or other federal law.
See 28 U.S.C. 2254(a) ("[A] district court shall entertain an
application for a writ of habeas corpus on behalf of a person in
custody pursuant to the judgment of a State court only on the
ground that he is in custody in violation of the Constitution or
laws or treaties of the United States."); see McMichaels v.
Hancock, 428 F.2d 1222, 1223 (1st Cir. 1970) (denying writ of

habeas corpus because petitioner raised no constitutional claim).

Violations of the provisions of an informal use immunity

agreement do not render statements subject to that agreement

compelled in violation of the Fifth Amendment.  United States v.

McLaughin, 957 F.2d 12, 16 n.4 (1st Cir. 1992) (distinguishing

between an oral promise of immunity from a prosecutor and a

formal grant of immunity under 18 U.S.C. § 6002).  In McLaughin,

the First Circuit rejected a defendant's claim that his Fifth

Amendment privilege against self-incrimination was violated where

documents he believed were protected pursuant to an informal

immunity agreement with federal prosecutors were used against him

at trial.  957 F.2d at 15-16.

> The government is authorized to grant use and
> derivative use immunity by 18 U.S.C. § 6002.
> Ordinarily such immunity is granted under these
> provisions when a defendant refuses to testify,
> claiming the Fifth Amendment privilege against self
> incrimination [citing Kastigar v. United States, 406
> U.S. 441 (1972)] . . . .  As there was no such formal
> grant of statutory immunity here, appellant's analysis
> of the case in those terms is incorrect.  The hearing
> on the motion to suppress was not, as appellant
> contends, a "Kastigar hearing."  The question here is
> simply the scope of any informal contractual agreement
> made between the parties and whether the government
> fairly lived up to its promises.

Id. at 16 n.4.

Questions as to the scope of informal immunity are,

therefore, governed by the contours of the contractual agreement,

not the Fifth Amendment self-incrimination jurisprudence.  Id.

("Informal promises of immunity have been recognized and enforced in a variety of circumstances short of the defendant's having claimed the Fifth Amendment privilege. . . . A defendant's rights are determined by the terms and conditions of the [immunity-in-exchange-for-cooperation] bargain as found by the court."). John, therefore, cannot present a Fifth Amendment claim that his statements were compelled.

John's due process claims under the Fifth and Fourteenth Amendment are not, however, foreclosed by <u>McLaughin</u>. John claims that his subsequently disclosed statements were made pursuant to an informal immunity agreement and were rendered involuntary upon violation of that agreement. Pet. Mem. at 31-32. While John raises a constitutional question, John must show more than the violation of an immunity agreement to obtain relief. "[T]he mere fact that an unfulfilled promise was made in exchange for a person's statement does not constitute coercion, rendering the statement involuntary or its fruits inadmissible." <u>United States</u> v. <u>Flemmi</u>, 225 F.3d 78, 91 (1st Cir. 2000). To exclude a statement as involuntary, a defendant must show that "coercive official tactics" were used to obtain the statement. <u>Id.</u> (quoting <u>United States</u> v. <u>Byram</u>, 145 F.3d 405 (1st Cir. 1998)). Deceptive police conduct can be considered sufficiently coercive

12

to render a confession involuntary.[11]  <u>Byram</u>, 145 F.3d at 408.  In

<u>Flemmi</u>, the First Circuit identified the following as evidence

that there was no coercion: (1) the record showed no threats of

retaliation or violence, (2) there was no evidence that the

agents were "consciously misleading" the informant, (3) the

informant was not incarcerated or being investigated at the time

the promises were made, and (4) the informant shared a social

relationship with the agents at the time of making the

statements.  <u>Flemmi</u>, 225 F.3d at 92.  John's voluntariness claim,

although constitutional, cannot be based solely on the fact that

the government reneged on its promise of immunity.

John also argues that the failure of the government to

adhere to an immunity agreement violates due process.  Pet. Mem.

at 6.  This plainly is a viable constitutional claim and perhaps

John's strongest argument for habeas relief.[12]  <u>See</u> <u>In re: Grand</u>

---

[11] Where a police officer makes a false statement to a
suspect that a co-conspirator has confessed, or when an officer
states to a suspect that they already have or will get physical
evidence incriminating the suspect are two examples of non-
coercive trickery.  <u>Byram</u>, 145 F.3d at 408 (citations omitted).
An example of a coercive deception is a police officer's false
threat to take a suspect's child away from her if she did not
cooperate.  <u>Lynumn</u> v. <u>Illinois</u>, 372 U.S. 528, 534 (1963).

[12] The First Circuit did not conduct a due
process/fundamental fairness analysis in <u>Flemmi</u> noting that the
case did not fall into a narrow exception for <u>unauthorized</u>
promises of immunity (those not made by a prosecutor) that would
allow the promise to be enforced if "the government's
noncompliance with an unauthorized promise would render a
prosecution fundamentally unfair."  <u>Flemmi</u>, 225 F.3d at 88 n.4.

<u>Jury John Doe</u>, No. 93-1485, 1993 WL 177144, at *3 (1st Cir. May 27, 1993) ("[D]ue process requires that the government adhere to the terms of any . . . immunity agreement it makes.") (ellipsis in original); <u>United States</u> v. <u>Pelletier</u>, 898 F.2d 297, 302 (2d Cir. 1990); <u>United States</u> v. <u>Fitch</u>, 964 F.2d 571, 576 (6th Cir. 1992).[13]  The government's failure to adhere to its promises made in connection with bargaining agreements undermines notions of fairness and justice.  <u>See</u> <u>United States</u> v. <u>Goldfaden</u>, 959 F.2d 1324, 1328 (5th Cir. 1992) (plea agreement) (stating "[t]he failure of the Government to fulfill its promise, therefore, affects the fairness, integrity, and public reputation of judicial proceedings."); <u>State</u> v. <u>Sturgill</u>, 469 S.E.2d 557, 558 (N.C. Ct. App. 1996) (promise not to prosecute) ("[W]e hold that traditional notions of substantial justice and fair play, as well as defendant's substantive due process rights, mandate a new trial, and suppression of defendant's confession.").  Due process dictates that the government adhere to the terms of its immunity agreement; whether Supreme Court precedent requires as much remains an open question.  John's claim also presents the interesting question of whether a state court is constitutionally obliged to adhere to the terms of a federal informal immunity

---

[13]  <u>See also</u> <u>United States</u> v. <u>Goldfaden</u>, 959 F.2d 1324, 1328 (5th Cir. 1992)(plea agreement); <u>United States</u> v. <u>Jensen</u>, 423 F.3d 851, 854 (8th Cir. 2005) (plea agreement); <u>United States</u> v. <u>Castellanos</u>, 904 F.2d 1490, 1496 (11th Cir. 1990) (plea agreement).

agreement.  For the reasons expressed below, the Court need not reach this issue as it cannot find that an informal immunity agreement existed between John and the federal government.

**C.    Was John Promised Immunity?**

**1.    The State Courts' Factual Findings**

A state court's determination of a factual issue is presumed to be correct and the petitioner carries "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. §§ 2254(d)(2) & (e)(1); <u>Norton</u> v. <u>Spencer</u>, 351 F.3d 1, 6 (1st Cir. 2003).  "The presumption of correctness is equally applicable when a state appellate court, as opposed to a state trial court, makes the finding of fact."  <u>Norton</u>, 351 F.3d at 6.

Neither the Superior Court nor the Supreme Judicial Court found any agreement between Novak and John that extended to statements he made pre-trial.  <u>Commonwealth</u> v. <u>John</u>, 442 Mass. 329, 333-34 (2004).  Both courts found that at the time of John's grand jury testimony the only agreement between John and Novak was that Novak would notify the Brooklyn District Attorney's office of his cooperation.  <u>Id.</u>; Super. Ct. Op. at 4.  The courts then credited Novak's recollection of the conversation between Novak and John in his jail cell, <u>see</u> Mot. to Suppress Hr'g Tr. at 88-94 <u>in</u> Pet. App. III, in finding that Novak threatened to "strip [John] of his privilege under the [Fifth Amendment] by granting him immunity" after John refused to testify at trial,

15

for the purpose of compelling John's testimony.[14]  <u>John</u>, 442 Mass. at 334; Super. Ct. Op. at 5.

If limited to these factual findings, the Court would be required to conclude that John did not have immunity for his pretrial statements.  The primary piece of evidence John relies on is the notice sent by Novak to defense counsel in the Poison Clan case stating that "John has been informed that he has use immunity for his statements meaning that anything that he says cannot be held against him in any fashion" (hereinafter "The Notice").  <u>See</u> Pet. Mem. at 28-30.  This statement is plainly ambiguous as to the scope of the immunity granted to John and whether it extends to pretrial statements.  The statement could mean that John will have immunity only for his trial testimony, as the state courts found, or that he will have immunity for his trial testimony and all of his pretrial statements.  The Notice, by itself, does not compel any particular interpretation.   In fact, the Superior Court, in crediting Novak's testimony regarding his discussion with John, interpreted the Notice as indicating that John had immunity only for his statements made at trial based on "the context of the discussion between Novak and

_____

[14]  See <u>John</u>, 442 Mass. at 335 ("The issue here is strictly one of credibility – whose account of their meeting and conversations was more credible, Novak's or John's"); Russo Opp'n at 12 ("In this case, the motion judge credited Novak's version of events, and the SJC affirmed this finding, which was well-supported by the record.")

John". <u>See</u> Super. Ct. Op. at 5 (defining Exhibit 5 - the
Notice); <u>John</u>, 442 Mass. at 334 (noting the Superior Court's
decision to interpret this Notice as limited to trial testimony
"when viewed in the context of all of the conversations between
Novak and John"). As such, the statement in the Notice cannot
establish by clear and convincing evidence that the Superior
Court erred in finding no immunity agreement as to John's
pretrial statements.[15]

### 2.    The September 23, 2000 Letter

This Court initially was prepared to reject outright John's
argument that the state courts erred in finding no informal
immunity agreement. Careful review of the record in this case,
however, revealed a letter dated September 23, 2000 and written
by Novak, which John had not brought to the attention of the
Court in filing this petition.
In this letter, Novak writes:

> In the spring of 1997, Mr. John began having problems
> while housed at the Northern Neck Regional Jail and
> indicated that [sic] may not cooperate with our office.
> I orally told him that he had use immunity for his

---

[15]    John argues that "the immunity notice must be read as a
contract or express promise – in accordance with its obvious
terms - and in a manner where any ambiguities favor the
defendant." Pet. Mem. at 28 (citing <u>United States</u> v. <u>Wells</u>, 211
F. 3d 988, 995 (6th Cir. 2000)). Even assuming this to be the
appropriate rule of interpretation within this Circuit, there
must first exist an informal immunity agreement to which the
government ought be bound. The Notice certainly does not
establish the existence of such an agreement, nor does the Notice
constitute such an agreement.

statements _to us_, meaning that anything that he said
cannot be held against him.  I told him that this was
conditioned upon him providing truthful evidence _to us_.
Again, during this time period, he was telling us that
he had not killed anyone.  In early June of 1997, prior
to the trial of the defendants in _United States_ v.
_Beckford_, I provided the defendants with a notice
regarding Mr. John that informed them that I had
conferred use immunity on Mr. John....We did not call
Mr. John to testify at the [Beckford trial].

Letter to Robert Tochka, Assistant District Attorney, Suffolk
County District Attorney's Office from Helen Fahey, United States
Attorney, by David Novak ("Novak Letter"), September 23, 2000 at
2-3 _in_ Pet. App. II at 45-46 (emphasis added).

    Here, in Novak's own words, is a statement of John's
immunity agreement as applying to John's pretrial statements to
law enforcement beginning in 1997, before his confession.  The
Court regards this letter as significant for two reasons:  1)
this letter contradicts Novak's testimony before the Superior
Court, that the immunity he promised John only applied to John's
trial testimony, placing Novak's credibility at issue and, 2) the
letter represents the only unambiguous expression of the scope of
John's immunity agreement.  If this letter is to be credited, it
could provide clear and convincing evidence that the state trial
courts erred in ruling that John did not have immunity at the
time of his confession.

    The Court, hard-pressed to believe that the Superior Court
and the Supreme Judicial Court would simply ignore such a
compelling piece of evidence, issued an order requiring that the

parties submit briefing as to the history of this letter in the state court proceedings.  <u>See</u> Order of December 15, 2005 [Doc. No. 14] at 2.  The briefing submitted by both parties precludes the Court's reliance on this letter to overturn the state court's ruling.

Both parties agree that the Commonwealth provided this letter to John during the discovery phase of his criminal case. <u>See</u> Suppl. Mem. Re: September 23, 2000 Letter [Doc. No. 17] ("Russo Suppl. Mem.") at 1.  The parties also agree that John attached the letter as an exhibit to his Motion to Suppress filed in Superior Court, <u>see</u> Mot. to Suppress at 2 <u>in</u> Pet. App. II at 26, and to his brief to the Supreme Judicial Court on direct appeal, Russo Suppl. Mem. at 2.[16]  The Novak letter was not discussed at the Motion to Suppress hearing. <u>See</u> Exhibit List for Mot. to Suppress Hearing, Pet. App. III at 3; <u>see generally</u> Tr. of Mot. to Suppress Hearing, Pet. App. III.

In John's brief before the Supreme Judicial Court, John challenged the veracity of Novak's statements concerning John's immunity agreement in the letter, stating:

Novak's September 25 [sic], 2000 letter [] states that

---

[16]  The Novak letter also appears to have been attached as an exhibit to John's other motions before the Superior Court. <u>See</u> Mot. to Dismiss Based Upon Kastigar Violations at 2 <u>in</u> Pet. App. II at 52 (citing a letter from Novak attached as Exhibit 3(a); Mot. to Preclude Use of Immunized Statements by Def. and Request for a Kastigar Hearing at 2 <u>in</u> Pet. App. II at 59 (citing a letter from Novak as Exhibit 3).

> John had informal immunity with the caveat that he
> provide truthful information.  As this letter was
> written three years after Mr. John's federal
> cooperation ended, it is a late attempt to amend the
> unrestricted use immunity granted Mr. John in 1996-
> 1997.

Def. Br. on Direct Appeal ("Direct Appeal Br.") at 12, n. 14 in

Pet. App. I at 34 (citations omitted).

> Again, Mr. Novak's September 25, 2000 letter to the
> Suffolk County DA's Office was written 3 years after
> the May 21, 1997 Notice regarding Dwight John was
> issued by Novak.  The best evidence of the immunity
> agreement is the Notice.

Id. at 32, n. 25 (citation omitted).

John makes a similar argument now, indicating that the Novak

letter simply confirms what is evident from the Notice and that

this Court should not credit the Novak Letter's reference to any

conditions attached to the immunity conferred on John.  Pet.

Suppl. Brief in Support of Habeas Pet. ("Pet. Suppl. Br.") [Doc.

No. 15] at 2-3.  John argues that fundamental fairness requires

this Court to find that John's immunity was not conditioned on

telling the truth, and that "[t]he objective evidence supports

only one conclusion:  that [] John had unconditional immunity

when he testified before the federal grand jury and then when he

later confessed to Agent Green during trial preparation."  Id. at

5-6.  John further states that "[t]he government has not provided

any written documentary evidence contemporaneous with those

events in 1996-1997 that would change or alter [the conclusion

that John had unconditional immunity."  Id. at 7.

John now, and before the Supreme Judicial Court, essentially argues against reliance on the single piece of evidence that would establish his immunity claims, because (1) the Novak letter was not written contemporaneously with the grant of immunity in 1997, and (2) it does not accurately detail the terms of the immunity agreement in suggesting that the immunity grant was conditional and that immunity was not granted until Spring, 1997.

The Novak letter certainly contradicts John's position that he had unconditional immunity from the time of his initial encounters with law enforcement.  In the letter, Novak writes, consistent with his testimony before the Superior Court, that the only agreement he had with John at that time of the grand jury was for Novak to notify the Brooklyn District Attorney's office of John's cooperation.  See Novak Letter.  The letter also states that the immunity granted to John was conditioned on his providing truthful evidence.[17]  Id.  Interestingly, if the Court

---

[17]  Russo argues that because the letter refers to immunity being conditioned on "providing truthful evidence," the Court should interpret this to mean that immunity was conditioned on "testifying (truthfully) on behalf of the United States in the Beckford prosecution."  Russo Suppl. Mem. at 3.  Russo argues that this is consistent with the state court's interpretation.  Id.  This is a very strained interpretation that, among other things, requires the Court to ignore the reference in the letter to the grant of use immunity for "his statements to us", which can only refer to his pretrial statements.  It also requires the Court to ignore the reference to that immunity being conditioned on "providing truthful evidence to us" and not to the Court.  Novak's letter and the state court's factual finding cannot be reconciled.

credited the statements in the letter, the immunity agreement would have only been in place a couple of months prior to John's confession, meaning that John would have satisfied the agreement as long as he provided truthful information beginning in the Spring of 1997.  Any untruthful statements or testimony John provided prior to the Spring of 1997 when the immunity agreement took effect, could not have voided the subsequent agreement.  The fact that the immunity was claimed to be conditional, therefore, would not have precluded a finding by this Court that John complied with the terms of that agreement once it was in effect. The conundrum created by John's position is that the only way for the Court to accept John's claim that he had unconditional immunity from the beginning of his interactions with law enforcement is to discredit the Novak letter, the only evidence the Court can find that would establish that an immunity agreement governing John's pre-trial statements existed.

Clear and convincing evidence is required to rebut the presumption of correctness attached to the state court's factual findings.  Because John challenges the accuracy and veracity of the Novak letter in detailing the immunity agreement, the Court cannot find that this letter constitutes the clear and convincing evidence required to overturn the Superior Court's factual

findings and credibility determinations.[18]

### D.    No Habeas Relief Can Be Granted

John's arguments for habeas relief are all based on the underlying determination that he had immunity for his pretrial statements.  Since the state court made a contrary finding and that finding cannot be rebutted by clear and convincing evidence, his arguments fail.

John also argues that fundamental fairness requires this Court to find that an immunity agreement existed between Novak and John.  Pet. Suppl. Br. at 5-6.  The only Supreme Court precedent explicitly governing immunity relates to the ability of the government to compel testimony through a grant of immunity when that immunity provides the same protection as the Fifth Amendment privilege.  See, e.g., Kastigar v. United States, 406 U.S. 441, 443 (1972) (holding that a federal grant of immunity

---

[18]    The only other potentially contradictory "evidence" is the fact that Novak never prosecuted John for his admitted illegal activities - participation in a drug gang, giving a gun to Chang's shooter - even though John supposedly had no immunity from Novak.  Novak explained, however, that he did not indict John because everything John testified to occurred in Brooklyn, outside his jurisdiction.  Mot. to Suppress Hr'g Tr. at 140: 16-18 in Pet. App. III.  He also stated that he sent his information on John and others to the Brooklyn U.S. Attorney's Office and the Brooklyn District Attorney's Office; he asked them to follow up but they failed to do so.  Id. at 140:19-23; see Id. at 141:11-18 ("I sent boxes of stuff saying look this is the stuff that really happened more in the [sic] New York than happened in Virginia. This is up to you guys to do your job.  I never heard from them again.")

pursuant to 28 U.S.C. § 6002 must be coextensive with the Fifth Amendment privilege in order to compel the testimony of a witness); see also Murphy v. Waterfront Comm'n of N.Y. Harbor, 378 U.S. 52, 79 (1964) ("[W]e hold the constitutional rule to be that a state witness may not be compelled to give testimony which may be incriminating under federal law unless the compelled testimony and its fruits cannot be used in any manner by federal officials in connection with a criminal prosecution against him."). There is no Supreme Court precedent governing when, as matter of law, a person is found to have informal immunity. There is also no Supreme Court precedent that holds, as matter of law, that if a witness is granted formal use immunity for his testimony, that immunity necessarily extends to statements made in preparation for that testimony. Therefore, the Court rejects John's contention that fundamental fairness requires a finding that John had unconditional immunity. The state court's ruling that John did not have immunity is simply not contrary to or an unreasonable application of Supreme Court precedent.

Having failed as to the immunity claim, John cannot otherwise establish a constitutional violation. The state courts properly analyzed the voluntariness of John's confession based on a totality of the circumstances. See Super. Ct. Op. at 8 (considering potential influence of intoxicants, presence of mental illness, familiarity of interview process, and knowledge

of <u>Miranda</u> rights); <u>John</u>, 442 Mass. at 336-7 (affirming Superior Court's ruling applying totality of the circumstances analysis). The Supreme Court's standard for determining if a defendant gave a voluntary confession is "whether [a] defendant's will was overborne" by the circumstances surrounding the giving of a confession.[19]   Id. at 336.   To determine "whether a defendant's will was overborne," a court must access "the totality of all the surrounding circumstances - both the characteristics of the accused and the details of the accused and the details of the interrogation."   <u>Dickerson</u> v. <u>United States</u>, 530 U.S. 428, 434 (2000); <u>see also</u> <u>Arizona</u> v. <u>Fulminante</u>, 499 U.S. 279, 285 (1991). In adopting the totality of the circumstances analysis when determining the voluntariness of John's confession, the state court did not apply law which was contrary to clearly established Supreme Court precedent.

The Superior Court did err, however, in finding that during

---

[19]   The Supreme Court previously held that: "[A] confession, in order to be admissible, must be free and voluntary: that is,. . . not. . . obtained by any direct or implied promises, however slight. . . .'" <u>See</u> <u>Shotwell Mfg. Co.</u> v. <u>United States</u>, 371 U.S. 341, 347 (1963) (citing <u>Bram</u> v. <u>United States</u>, 168 U.S. 532, 542-543 (1897)).   The test under <u>Shotwell</u> and <u>Bram</u>, however, is no longer the standard for determining the voluntariness of a confession; instead, the Supreme Court today applies a totality of the circumstances test to determine whether a person's free will was overborn. <u>See</u> <u>Arizona</u> v. <u>Fulminante</u>, 499 U.S. 279, 285 (1991) (stating, "it is clear that this passage from [<u>Bram</u>] [u]nder current precedent does not state the standard for determining the voluntariness of a confession. . . ."); <u>Dickerson</u>, 530 U.S. at 434.

the meeting between Green and John where John confessed, Green
never asked John directly whether he committed a murder.
According to the Superior court, John appeared agitated and Green
asked whether the Beckford defendants knew something about him
that the government did not, that might come up at trial; John
then told Green that he killed Bufong.  Super. Ct Op. at 6; <u>see</u>
<u>John</u>, 442 Mass. at 335.  This account is plainly contradicted by
the record.  According to Green's testimony at John's grand jury
hearing and at the motion to suppress hearing, he specifically
asked John if "he committed a murder that he had not discussed
with law enforcement."[20]  Mot. to Suppress Hr'g Tr. at 243:7-19;
263:3-19; Grand Jury Hr'g Tr. at 9:4-11.  Though a clearly
erroneous factual finding, it does not lead the Court to conclude
that the state courts unreasonably applied the law to the facts.[21]

_____

[20]  Green's FBI report summarizing the interview also
reflects that he asked John directly about committing a murder.
FBI Interview Summary, Pet. App. II at 33.
     The record shows that FBI Agent Green knew about John's
involvement with the Bufong murder before Green interviewed John
on June 20th, 1997.  Prior to his meeting with John, on January
23, 1997,  Green had been informed by Winston Gordon that John
murdered Bufong.  <u>See</u> Mot. to Suppress Hr'g Tr. at 245:19-246:14.
On March 3, 1997, Green called the Boston Police Department about
the Bufong murder and learned that John was arrested for the
murder but that the case was dismissed without prejudice because
of lack of a good witness.  <u>See</u> Untitled Report, Pet. App. II at
41.

[21]  The Court also cannot conclude that the state court made
an unreasonable determination of facts warranting habeas relief.
Although this may have been an unreasonable determination of
facts, the Court cannot find that the state courts' decisions
were <u>based on</u> this incorrect finding, as required for habeas

The state courts, applying the totality of the circumstances test, were reasonable in ruling that the confession was not coerced, despite the fact that Green's question was in fact more pointed and aggressive than they determined.

The state courts also properly concluded that John was not entitled to <u>Miranda</u> warnings.  Whether or not Green asked John directly about the murder, Green's meeting with John would properly be considered an interrogation.  <u>See</u> <u>Rhode Island</u> v. <u>Innis</u>, 446 U.S. 291, 301 (1980) (defining interrogation for purposes of <u>Miranda</u> as "not only to express questioning but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response").

The Superior Court, however, reasonably ruled that John was not "in custody" for the purposes of <u>Miranda</u> when he confessed, Super. Ct. Op. at 7, and therefore the <u>Miranda</u> safeguards are not implicated regardless of whether or not he was interrogated.

The test for whether <u>Miranda</u> warnings are required is "whether a reasonable person would believe he is 'in custody' under the circumstances." <u>United States</u> v. <u>Pagan-Santini</u>, 451 F.3d 258, 263 (1st Cir. 2006).  John's incarceration at the time of the meeting does not warrant a finding that he was "in

─────────────────────

relief under § 2254(d)2.  <u>See</u> 28 U.S.C. § 2254(d)(2) (stating that "the decision [must be] based on an unreasonable determination of facts in light of the evidence").

27

custody" for purposes of Miranda.  See Commonwealth v. Larkin,

429 Mass. 426, 434 (1999) (citing federal and state cases

requiring some additional measure of restraint "in addition to

those normally imposed on [a prisoner] by virtue of his status as

an inmate").   For the purposes of the Miranda "custody"

analysis, the Superior Court found that John was in a well-lit

courthouse, was experienced and knowledgeable in the trial

proceedings, had received Miranda warnings several times, had

been interviewed several times by law enforcement in the Beckford

case, and had initiated the relationship with the government.

Super. Ct. Op. at 7.  The Superior Court also observed that John

was clear and lucid on June 20 and was not experiencing any

symptoms of mental illness.  Id. at 8.  For the reasons expressed

above, however, this Court must reject the Superior Court's

characterization of Green's questions as hostile or aggressive.

Id.  Green's question about the murder is properly characterized

as aggressive.  John, however, was in neutral surroundings - the

courthouse, with only Green present, and no additional physical

restraint beyond that required due to his status as an inmate.

See United States v. Nishnianidze, 342 F.3d 6, 13 (1st Cir. 2003)

("Among the factors to consider are whether the suspect was

questioned in familiar or at least neutral surroundings, the

number of law enforcement present at the scene, the degree of

physical restraint placed upon the subject, and the duration and

character of the interrogation" (quotation omitted)).  Although
the record reflects that Green certainly interrogated John as to
his involvement in the Bufong murder, and more aggressively than
the state courts believed, there was nothing remarkable or
particularly coercive about his manner of interrogation.  The
Court, therefore, has no basis for concluding that the state
courts' determination that John was not in custody for purposes
of <u>Miranda</u> was unreasonable.

Based on the factual findings of the Superior Court, John
does not succeed in showing that the state courts applied law
which was "contrary to," or an "unreasonable application of"
clearly established Supreme Court precedent.


IV. **CONCLUSION**

Accordingly, John's Petition Under 28 U.S.C. § 2254 for Writ
of Habeas Corpus [Doc. No. 1] is DENIED.

SO ORDERED.


/s/ William G. Young

WILLIAM G. YOUNG
DISTRICT JUDGE

29